**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Lisa Michelle LAMBERT, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 14, 1999.
Filed Dec. 18, 2000.

Peter S. Greenberg, Philadelphia, for appellant.

Christy H. Fawcett, Deputy Attorney General, Harrisburg, for Com., appellee.

Before KELLY, HUDOCK, and HESTER, JJ.

KELLY, J.:

¶ 1 Appellant, Lisa Michelle Lambert asks us to review and reverse the order of the Lancaster County Court of Common Pleas, which denied her petition for relief under the Post Conviction Relief Act.[1] Appellant raises numerous assertions of ineffectiveness of counsel and prosecutorial misconduct in the context of after-discovered evidence, which she insists compel relief. Following exhaustive study of the complete record in light of applicable law we hold that Appellant' has not met her burden under the PCRA statute. Accordingly, we affirm.

¶ 2 The PCRA court has carefully and painstakingly set forth the relevant facts and extensive procedural history of this case in its opinion, dated August 24, 1998. *See Commonwealth v. Lambert,* 1998 WL 558749 (Pa.Com.Pl. Aug 24 1998). The PCRA court also included in that opinion, its findings of fact and conclusions of law pertaining to the 1992 verdict and judgment of sentence. (*Id.* at § IV.) Therefore, we will provide a more abbreviated factual and procedural background based upon a review of the certified record and the numerous court opinions generated in this case.

¶ 3 In 1991, Appellant was romantically involved with Lawrence Yunkin. During a brief interlude in their relationship, Yunkin dated Laurie Show. Appellant strongly resented Laurie Show for dating Yunkin, as evidenced by Appellant's numerous phone calls and public confrontations with Laurie Show during the ensuing months. To appease her anger, Appellant orchestrated a plan with some friends to "kidnap" Laurie Show and publicly humiliate her. Nothing came of the plan, as several members of the group warned Laurie Show.

¶ 4 Appellant, however, continued to publicly confront Laurie Show. At one point, Appellant challenged Laurie Show at the mall and struck her. After that incident, Laurie Show and her family sought help from law enforcement officials. Without enumerating other incidents of Appellant's attempts to intimidate Laurie Show, the evidence made clear that she was indeed afraid of Appellant. Appellant's anger and ill will, that from all accounts marked this relationship, finally culminated early in the morning of December 20, 1991, when Appellant and company entered Laurie Show's home, brutally attacked, and murdered her.

¶ 5 In the late evening of December 20, 1991, the police took Appellant, her boyfriend, Lawrence Yunkin, and a friend, Tabitha Buck into custody. The police read Appellant her rights, which she then waived. Following questioning, Appellant gave the police an alibi statement. Soon, however, Appellant gave another statement in which she admitted her involvement in Laurie Show's murder. Based upon her statements, Appellant was arrested and charged.

¶ 6 In an extensive colloquy Appellant waived her right to a jury trial, and the matter proceeded before the Honorable Lawrence F. Stengel in the Lancaster County Court of Common Pleas. Both direct and circumstantial evidence presented at trial inextricably linked Appellant to Laurie Show's murder. Based upon the evidence presented and its credibility determinations (fully set forth in its opinions, dated July 19, 1994, at 1–10, and August

1. 42 Pa.C.S.A. §§ 9541–9546.

24, 1998, at 60–72), the trial court rejected Appellant's several diverse versions of the event. Accordingly, Appellant was convicted of first-degree murder[2] and criminal conspiracy[3] arising from Laurie Show's death. After a death penalty hearing, Appellant was sentenced to life imprisonment on the first-degree murder conviction.

¶ 7 Appellant filed post-verdict motions on July 27, 1992 with trial counsel and additional post-verdict motions with new counsel. The trial court denied the motions. Appellant filed a direct appeal with the Superior Court, raising claims of trial error, ineffective assistance of trial counsel, and prosecutorial misconduct in the context of after-discovered evidence. In a memorandum opinion, this Court affirmed Appellant's judgment of sentence on January 4, 1996. *See Commonwealth v. Lambert*, 450 Pa.Super. 714, 676 A.2d 283 (1996). Appellant sought *allocatur* with our Supreme Court, raising the same claims. The Supreme Court subsequently denied Appellant's petition for allowance of appeal on July 2, 1996. *See Commonwealth v. Lambert*, 545 Pa. 650, 680 A.2d 1160 (1996).

¶ 8 Notably, Appellant did not file a petition under the PCRA. Instead, she forwarded a *pro se* handwritten petition for *habeas corpus* to the federal court on September 12, 1996. The court referred her petition to present counsel to represent Appellant on a *pro bono* basis.

¶ 9 Counsel filed an amended petition for *habeas corpus* relief on Appellant's behalf on January 3, 1997. The amended petition raised claims that had been presented in Appellant's prior state court proceedings and added new claims of actual innocence and prosecutorial misconduct. The Commonwealth timely raised the defense of Appellant's failure to exhaust state remedies.

¶ 10 Despite the Commonwealth's steadfast objection to the proceedings, the federal district court advanced the matter to an evidentiary hearing. The evidence presented in the district court in large part was obtained through broad federal discovery, evidence that had previously been unavailable in state court. (*See* PCRA Court Opinion, dated August 24, 1998, at 11 n. 9.)

¶ 11 Following extensive testimony, on April 21, 1997, the federal district court rejected the state trial court's findings of fact, which had been affirmed in state court on appeal. The federal district court granted Appellant's petition in a highly publicized decision, which found Appellant actually innocent,[4] barred retrial on double jeopardy grounds, and set her free. On April 22, 1997, the Commonwealth filed a timely notice of appeal to the Third Circuit Court of Appeals.

¶ 12 On appeal, the Commonwealth reasserted its nonexhaustion of state remedies defense. Appellant countered that the Commonwealth had implicitly waived its defense and that any further state litigation would be futile, because she had already either raised or waived all of her claims in state court. The court of appeals first examined the Commonwealth's nonexhaustion defense. The court of appeals concluded that preclusion of the Commonwealth's defense required an express waiver under prevailing law, and noted that the Commonwealth had vigorously pursued

2. 18 Pa.C.S.A. § 2502.

3. 18 Pa.C.S.A. § 903.

4. "A finding of actual innocence, as that term has come to be used in federal *habeas corpus* jurisprudence, is not the equivalent of a finding of not guilty by a jury or by a court in a bench trial." *Lambert v. Blackwell*, 134 F.3d 506, 509 (3d Cir.1997). Absent a United States Supreme Court pronouncement, deci-

sions of federal courts are not binding on state courts, even when a federal question is involved. *See Commonwealth v. Ragan*, 560 Pa. 106, 743 A.2d 390 (1999); *Cambria–Stoltz Enterprises v. TNT Investments*, 747 A.2d 947 (Pa.Super.2000). Therefore, Appellant does not come before us now as an innocent person wrongly convicted. (*See* PCRA Court Opinion, dated August 24, 1998, at 78).

and preserved its defense. *Lambert, supra*, 134 F.3d at 514–15. The court also explained that exhaustion of state remedies is not a jurisdictional requirement for the federal court, but a rule of comity.[5] *Id.* at 523 n. 29.

¶ 13 After careful analysis, the court of appeals also concluded that review of several of Appellant's claims was not clearly foreclosed under Pennsylvania law. The court, therefore, rejected Appellant's assertion of the futility exception to the rule of comity, stating: "[U]nless a state court decision exists indicating that a *habeas* petitioner is clearly precluded from state court relief, the federal *habeas* claim should be dismissed for non-exhaustion, even if it appears unlikely that the state will address the merits of the petitioner's claim." *Id.* at 519 (citing *Banks v. Horn*, 126 F.3d 206 (3d Cir.1997)).

¶ 14 The court of appeals further discussed Appellant's options under Pennsylvania law to qualify for relief under the PCRA. *Id.* at 520 (citing 42 Pa.C.S.A. § 9543(a)(2)(i), (ii) and (vi)). Finally, the court proposed several solutions to the timeliness requirements of the amended PCRA, including application of the Pennsylvania Transfer Statute or the possibility that Appellant plead and prove one or more of the exceptions found in Section 9545(b)(1). *Id.* at 522–24. On December 29, 1997, the court of appeals vacated the order of the federal district court granting Appellant's petition for writ of *habeas corpus* and remanded the matter with instructions to dismiss the petition without prejudice.

¶ 15 Appellant filed a petition for *certiorari* with the United States Supreme Court on April 23, 1998, and docketed at No. 97–8812. To the best of this Court's

knowledge, that petition remains undetermined.

¶ 16 Meanwhile, Appellant returned to state court and asked the Pennsylvania Supreme Court to assume plenary jurisdiction of her case. Our Supreme Court denied the request. On the same day, February 2, 1998, Appellant filed her PCRA petition.

¶ 17 Appellant's PCRA petition contained almost two hundred (200) claims of after-discovered evidence, discovery violations, and ineffective assistance of counsel. Contemporaneously with Appellant's petition and the Commonwealth's answer, some seventeen pre-hearing motions and/or petitions were presented for the PCRA court's disposition, including Appellant's motion to admit the record from the federal district court *habeas* hearing. The PCRA court denied Appellant's motion to enter the federal record. Appellant's motions for recusal and for bail/release pending the PCRA disposition were also denied. Numerous other pre-hearing conferences and motions were disposed of as follows:

> Specifically, (1) the court denied the motion for more definite pleading, (2) the court denied as moot the motion for sanctions for violations of the gag order, (3) the court denied the motion to sit outside Lancaster County, (4) the court denied [Appellant]'s request to incorporate certain admissions from the federal *habeas* hearing, (5) the court granted the motion to proceed *in forma pauperis* and to have all costs necessary for the PCRA proceeding reimbursed by the County, and (6) the court denied the motion for court appointment of defense counsel.

---

5. Quoting the court of appeals' opinion, we note:

> The doctrine of comity teaches that one court should defer action on causes properly within its jurisdiction until the courts of *another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the* matter. Indeed … requiring exhaustion of state remedies addresses federalism and comity concerns by affording the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.
>
> *Id.* at 513 n. 18.

(*Id.* at 24.)[6] The court's order limiting publicity surrounding the PCRA proceedings was appealed as a collateral order to this Court and decided in a published opinion on December 17, 1998. *See Commonwealth v. Lambert,* 723 A.2d 684 (Pa.Super.1998) (holding attorney's disciplinary rule on trial publicity does not violate First Amendment free speech guarantee and court's order limiting publicity was not unconstitutional or void for vagueness).

¶ 18 The PCRA hearing commenced on April 30, 1998. Closing arguments occurred eight weeks later on June 24, 1998. The PCRA court decided twenty-eight (28) motions with orders and authored four (4) opinions. The court's principal opinion exceeds three hundred and twenty (320) pages. Ultimately, the PCRA court denied Appellant relief on November 23, 1998. This timely appeal followed. The record on appeal includes seven (7) volumes of trial testimony and additional transcripts from pre-trial and post-trial proceedings, thirty-six (36) volumes of PCRA hearing testimony, and numerous other filings.

¶ 19 On appeal, Appellant presents a number of issues for our review:

DID THE [PCRA] COURT ERR IN REFUSING TO OVERTURN [APPELLANT]'S CONVICTION AND REFUSING TO BAR RETRIAL—BECAUSE OF THE PROSECUTORIAL MISCONDUCT TO WHICH SHE WAS SUBJECTED, INCLUDING THE KNOWING PRESENTATION OF FALSE EVIDENCE, THE FABRICATION OF EVIDENCE, THE INTENTIONAL WITHHOLDING OF EXCULPATORY AND FAVORABLE EVIDENCE FROM [APPELLANT], AND THE DISOWNING OF EVIDENCE USED TO CONVICT; THE BIAS AND PREJUDICE OF THE [PCRA] COURT; AND THE AFTER DISCOVERED EVIDENCE WHICH CORROBORATES HER STORY—AS A MATTER OF DOUBLE JEOPARDY, DUE PROCESS, AND BECAUSE OF THE COMMONWEALTH'S DESTRUCTION OF EVIDENCE?

DID THE [PCRA] COURT COMMIT SO MANY ORGANIC ERRORS IN ITS HANDLING OF THE PROCEEDINGS, INCLUDING THE REFUSAL TO ACCEPT THE FEDERAL RECORD FOR FILING, THE COMPLETELY ERRONEOUS DETERMINATION OF WHAT [APPELLANT] SUPPOSEDLY ADMITTED TO, THE REFUSAL TO ALLOW THE CROSS EXAMINATION BY [APPELLANT] OF THE PERPETRATORS OF THE MISCONDUCT, WHILE ALLOWING THE COMMONWEALTH TO LEAD ITS OWN WITNESSES, AND THE USE OF THE WRONG STANDARD OF REVIEW, SO THAT THE RECORD IS COMPLETELY CORRUPTED AND THE [PCRA] COURT'S FINDINGS ARE NOT ENTITLED TO ANY DEFERENCE?

(Appellant's Brief at 2).

¶ 20 As a prefatory matter, this case falls within the purview of the amended PCRA, effective January 16, 1996. *See Commonwealth v. Fahy,* 558 Pa. 313, 737 A.2d 214 (1999) (stating effective date of PCRA amendments was January 16, 1996). Thus, we must first examine whether Appellant's PCRA petition comports with the timeliness requirements under the amended Act.

¶ 21 Section 9545 of the applicable PCRA requires, as a matter of jurisdiction, that all PCRA petitions must be filed within a specific time after judgment becomes final. *Id.* at 321, 737 A.2d at 217–18. The Act, in pertinent part, provides:

**§ 9545. Jurisdiction and proceedings**

(a) **Original jurisdiction.**—Original jurisdiction over a proceeding under this

---

**6.** Citing the Pennsylvania Rules of Criminal Procedure, Rule 1504(a), the PCRA court explained that Appellant was able to "otherwise procure counsel," as she continued to be represented by her *pro bono* counsel.

subchapter shall be in the court of common pleas. No court shall have authority to entertain a request for relief in anticipation of the filing of a petition under this subchapter.

**(b) Time for filing petition.—**

(1) Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, **unless the petition alleges and the petitioner proves** that:

(i)the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;

(ii)the facts upon which the claim was predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or

(iii)the right asserted is a constitutional right that has been recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

(2) Any petition invoking an exception provided in paragraph (1) shall be filed within 60 days of the date the claim could have been presented.

(3) For purposes of this subchapter, a judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time seeking the review.

(4) For purposes of this subchapter, "government officials" shall not include defense counsel, whether appointed or retained.

42 Pa.C.S.A. § 9545(a), (b)(1)(i)–(iii), (2)–(4) (emphasis added). The appellant in

*Fahy* offered a number of arguments based upon the constitutionality and legality of the PCRA amendments and other equitable considerations to support review of the merits of his petition, which was untimely on its face. In particular, Appellant invoked the principle of equitable tolling as a basis for the Supreme Court to deem his petition timely under the PCRA. According to Appellant, the rule of comity required tolling of the time for filing his PCRA petition while he pursued his federal *habeas* remedies. The *Fahy* Court rejected this argument, explaining as follows:

Jurisdictional time limits go to a court's right or competency to adjudicate a controversy. These limitations are mandatory and **interpreted literally; thus, a court has no authority to extend filing periods except as the statute permits.** Unlike a statute of limitations, a jurisdictional time limitation is not subject to equitable principles such as tolling except as provided by statute. Thus, the **filing period is only extended as permitted; in the case of the PCRA, the time limitations are extended upon satisfaction of the exceptions found in § 9545(b)(1)(i)–(iii) and timely filing pursuant to (b)(2).** As it has been established that the PCRA's time restrictions are jurisdictional, we hold that the period for filing a PCRA petition is not subject to the doctrine of equitable tolling, save to the extent the doctrine is embraced by § 9545(b)(1)(i)–(iii).

Additionally, Appellant's argument, that because federal *habeas corpus* time requirements are tolled during state review, the PCRA's time limitations are tolled during federal review, is without merit. In *Lovasz* [*v. Vaughn,* 134 F.3d 146 (3d Cir.1998) ], the Third Circuit held that a state petition for post-conviction relief tolled the time requirements for filing a writ of *habeas corpus* under 28 U.S.C. § 2254. *Lovasz* is easily distinguished. First, the *Lovasz*

court was interpreting the AEDPA[7] which contains a specific section as to tolling. 28 U.S.C. § 2244(d). Section 2244(d) does not include for purposes of time computation the period during which a properly filed application for state post-conviction or other collateral review with respect to the judgment is pending. The PCRA contains no analogous provision regarding the application for federal *habeas corpus* relief. Additionally, the *Lovasz* court emphasized that pursuant to the exhaustion doctrine, it was the policy of the federal system that the states should have the first opportunity to address and correct alleged violations of a state prisoner's federal rights.... The same policy concerns are not implicated in the reverse situation. To allow tolling of the PCRA's time limitations where a writ for federal *habeas* relief has been filed would undermine the federal policy of initial state review, and in fact, would encourage initial review in the federal system.

*Id.* at 329–30, 737 A.2d at 222–23 (emphasis added). Therefore, if a PCRA petition is not filed within one year of the date that the judgment of sentence becomes final; or is not eligible for one of the three limited statutory exceptions to the timeliness requirement; or is entitled to one of the exceptions, but the exception is not asserted within sixty (60) days of the date that the claim could have been brought; then the court has no jurisdiction to address the substantive merits of the petition. *Commonwealth v. Gamboa–Taylor,* 562 Pa. 70, 753 A.2d 780 (2000).

¶ 22 In the instant case, the Pennsylvania Supreme Court denied Appellant's petition for review on July 2, 1996. Appellant's judgment of sentence became final on September 30, 1996, upon expiration of the ninety (90) day period for seeking review with the Supreme Court of the United States. *See* 42 Pa.C.S.A. § 9545(b)(3); Supreme Court Rule 13. Thus, Appellant had until September 30, 1997 to file a PCRA petition.

¶ 23 Appellant, however, filed a *pro se* handwritten *habeas* petition in the federal court on September 12, 1996. The federal district court retained the matter and proceeded to address the merits of Appellant's claims. Its decision was rendered on April 21, 1997, when the PCRA time limits relevant to Appellant's case had not yet expired. The Commonwealth appealed from the federal district court's decision on April 22, 1997, and the Third Circuit Court of Appeals reversed that decision on December 29, 1997. Appellant filed a PCRA petition in state court for the first time on February 2, 1998. On its face, Appellant's PCRA petition is out of time, as it was filed over sixteen months after her judgment of sentence became final and four months after the expiration of the one year jurisdictional time limit set forth in the PCRA. *See* 42 Pa.C.S.A. § 9545(b).

¶ 24 In reversing the federal district court's decision, the court of appeals expressed its concern for the timeliness provisions of the amended PCRA. Utilizing the Pennsylvania Transfer Statute at 42 Pa.C.S.A. § 5103,[8] the federal court sug-

---

**7.** Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") (effective April 24, 1996).

**8.** Section 5103 states:

§ 5103. **Transfer of erroneously filed matters**
(a) **General rule.**—If an appeal or other matter is taken to or brought in a court ... of this Commonwealth which does not have jurisdiction of the ... matter, the court ... shall not quash ... or dismiss the matter, but shall transfer the record thereof to the

proper tribunal of this Commonwealth, where the ... matter shall be treated as if originally filed in a court ... of this Commonwealth. A matter which is within the exclusive jurisdiction of a court ... of this Commonwealth shall be transferred by the other tribunal to the proper court ... where it shall be treated as if originally filed in the transferee court ... on the date when it was first filed in the other tribunal.
(b) **Federal cases.**—
(1) Subsection (a) shall also apply to any matter transferred or remanded by any

gested that the state court could deem Appellant's subsequent PCRA petition timely filed as of the date her *habeas* petition had been filed in federal court. The court of appeals also stated:

> We hasten to add, however, that we are not endorsing the application of the transfer statute in all federal *habeas* actions dismissed for nonexhaustion. Rather, we suggest that transfer may be appropriate where, as here, the district court did not originally dismiss the petition for failure to exhaust state remedies. Instead, the court prematurely proceeded to adjudicate the merits of the claim during which the one-year statute of limitations expired. Under these unique circumstances, the Pennsylvania transfer statute may apply and any action commenced by [Appellant] under the PCRA would be treated as filed on September 12, 1996, the date on which she filed her petition for writ of *habeas corpus* in the district court.

*Lambert, supra,* 134 F.3d at 522–23. Therefore, one issue of jurisdiction under the PCRA in this case is whether we can employ the Pennsylvania Transfer Statute as suggested by the federal court, in light of our Supreme Court's decision in *Fahy, supra.*

¶ 25 Section 5103 allows the federal court to transfer an erroneously filed case to the Court of Common Pleas, rather than dismissing it outright. 42 Pa.C.S.A. § 5103(a), (b)(1)–(2). The stated policy behind this section is to preserve a claim or cause of action timely filed in federal court on the ground that the claimant should not lose her opportunity to litigate the merits of the claim simply because she erred regarding federal jurisdiction. *See Suburban Roofing Co., Inc. v. Day & Zimmerman, Inc.,* 578 F.Supp. 374 (E.D.Pa.1984). Thus, the transfer statute ameliorates "the hardship on litigants who inadvertently file their action in the wrong place." *Electronic Lab Supply Co. v. Cullen,* 782 F.Supp. 1016 (E.D.Pa.1991), *affirmed,* 977 F.2d 798 (3d Cir.1992) (citing *McLaughlin v. Arco Polymers, Inc.,* 721 F.2d 426 (3d Cir.1983)). This Court has explained:

> Section 5103 has been interpreted to be applicable in situations...where the federal court dismisses an action due to **lack of jurisdiction.** We have held that a litigant should file a certified transcript of the final judgment of the federal court and a certified transcript of the pleadings from the federal action, rather than new pleadings in the state court.

*Ferrari v. Antonacci,* 456 Pa.Super. 54, 689 A.2d 320, 322 (1997), *appeal denied,* 548 Pa. 670, 698 A.2d 594 (1997) (emphasis added). Quoting *Williams v. F.L. Smithe Mach. Co.,* 395 Pa.Super. 511, 577 A.2d 907, 910 (1990), *appeal denied,* 527 Pa. 650, 593 A.2d 422 (1991), this Court said:

> [F]or the benefit of both bench and bar, we now emphasize that in order to protect the timeliness of an action under 42 Pa.C.S.A. § 5103, a litigant, upon having his case dismissed in federal court for **lack of jurisdiction,** must promptly file a certified transcript of the final judg-

---

United States court for a district embracing any part of this Commonwealth. In order to preserve a claim under Chapter 55 (relating to limitation of time), a litigant who timely commences an action or proceeding in any United States court for a district embracing any part of this Commonwealth is not required to commence a protective action in a court ... of this Commonwealth. Where a matter is filed in any United States court ... and the matter is **dismissed for lack of jurisdiction,** any litigant ... may transfer the matter to a court ... by complying with the transfer provisions set forth in paragraph (2).

(2) Except as otherwise prescribed by general rules, or by order of the United States court, such transfer may be effected by filing a certified transcript of the final judgment of the United States court and the related pleadings in a court ... of this Commonwealth. The pleadings shall have the same effect as under the practice in the United States court, but the transferee court ... may require that they be amended to conform to the practice in this Commonwealth.

42 Pa.C.S.A. § 5103(a), (b)(1)–(2) (emphasis added).

ment of the federal court and, at the same time, a certified copy of the pleadings from the federal action. The litigant shall not file new pleadings in state court.

*Ferrari, supra* at 323 (emphasis added).

¶ 26 By its express terms, the Pennsylvania Transfer Statute contemplates that the transferring court is without jurisdiction, before transfer of the matter is authorized under the statute. *See* 42 Pa.C.S.A. § 5103(a), (b)(1). The present case, however, was not dismissed from federal court for lack of jurisdiction. *See Lambert, supra,* 134 F.3d at 516, 523 n. 29 (stating when district court dismisses federal *habeas* petition for nonexhaustion, it nevertheless has jurisdiction; dismissal is based on principles of comity afforded state courts). *See also Peterkin v. Horn,* 34 F.Supp.2d 289 (E.D.Pa.1998). On that basis alone, we could conclude that the Pennsylvania Transfer Statute does not apply. *See Ferrari, supra*

¶ 27 Additionally, we note that Appellant's counsel has made no record effort to comply with the requirements for proper transfer under Section 5103. *See id.* There is nothing on the docket or in the certified record to indicate that Appellant's

counsel promptly filed a certified transcript of the final judgment of the federal court and, at the same time, a certified copy of the pleadings from the federal action.[9] *Id.*

¶ 28 Further, we have not been provided with, or independently located, any case law to support the proposition that the Pennsylvania Transfer Statute can be used to circumvent the time limitations of the PCRA. As *Fahy* states, the PCRA does not permit the tolling of time limitations except as provided in the PCRA statute. *See Fahy, supra* (limiting doctrine of equitable tolling only to that provided in Section 9545(b)(1)(i)–(iii)). *See also Commonwealth v. Hutchins,* 760 A.2d 50 (Pa.Super.2000) (holding untimely petition for allowance of appeal with Pennsylvania Supreme Court, which later denied petition, does not operate to circumvent time restrictions of PCRA by altering date on which appellant's sentence became final).[10, 11] As *Fahy* also states, tolling undermines the federal policy of initial state review and encourages initial review in the federal system. *See id.*

¶ 29 Appellant and her counsel were or should have been aware of the PCRA's

---

**9.** We also reject any assertion that Appellant's effort to have the transcripts from the federal proceedings admitted wholesale by the PCRA court constitutes proper transfer under the statute. Appellant's request was made to avoid the need for any PCRA hearing whatsoever. The PCRA court denied this request in its opinion, dated April 6, 1998, stating:

> There is no legal basis for this court to accept the record of the federal *habeas corpus* hearing as the record of this PCRA proceeding.... The federal record would not remove the need for a PCRA hearing under Pa.R.Crim.P. 1508. It appears that the Commonwealth might not have presented a full defense on the merits in light of its legal argument on nonexhaustion. Finally a resolution of the many issues of fact raised in the pleadings require[s] the kind of credibility assessments that only a hearing can provide.

(*See* PCRA Court Opinion, dated April 6, 1998, at 21).

**10.** Only a few other jurisdictions have considered this issue. *See Seals v. State,* 23 S.W.3d 272 (Tenn.2000) (holding statute of limitations for filing petition for post-conviction relief not tolled by general savings statute; tolling limited to reasons enumerated in state post-conviction relief act); *Cochran v. State,* 133 Idaho 205, 984 P.2d 128 (App.1999) (holding limitations period for filing petition for post-conviction relief runs from date of final judgment, not from date of subsequent order revoking appeal bond); *Martinez v. State,* 130 Idaho 530, 944 P.2d 127 (App. 1997) (holding time limits for filing PCRA not renewed or extended by filing any other collateral post-judgment proceeding). *But see Allen v. Butterworth,* 756 So.2d 52 (Fla.2000) (holding Florida constitution grants Supreme Court exclusive authority to set deadlines for post-conviction motions; therefore, legislation setting time limits is unconstitutional).

**11.** We invite our Supreme Court to look at this important issue.

jurisdictional time constraints. The amended statute went into effect nine months before Appellant's judgment of sentence became final. Appellant and her counsel had ample opportunity to bring Appellant's PCRA petition within the jurisdictional time limits. Instead, Appellant's counsel vigorously sought to remain in federal court arguing, *inter alia*, that Appellant's claims were procedurally barred in state court. When counsel took this position in federal court, it was not wholly clear that all of Appellant's claims were indeed exhausted or futile. *See Lambert, supra*, 134 F.3d at 515–19. Nevertheless, while pursuing this position in federal court, counsel virtually guaranteed foreclosure of Appellant's claims in state court by allowing the PCRA jurisdictional time limits to expire. *See id.*

¶ 30 Based upon the dictates of the PCRA, Appellant has not satisfied the statute's time requirements, where her PCRA petition was not filed until sixteen months after her judgment of sentence became final. *See Fahy, supra*; 42 Pa. C.S.A. § 9545(b)(1). Thus, jurisdiction under the PCRA is lacking, unless Appellant's petition has alleged and Appellant has proved that one of the exceptions set forth in Section 9545(b)(1)(i)–(iii) applies. *See* 42 Pa.C.S.A § 9545(b)(1). We note that the federal court of appeals also suggested this alternative in its decision. *See Lambert, supra*, 134 F.3d at 523–24.

■ ¶ 31 We have carefully reviewed Appellant's PCRA petition for any assertion or discussion on the timeliness issue. The only reference to the PCRA time limitations in Appellant's petition states:

2. The Court of Appeals for the Third Circuit has hypothesized that these claims are not waived; that they are not time-barred; and that the record from the federal proceeding may be transferred pursuant to the Pennsylvania Transfer Statute, 42 Pa.C.S. § 5103.

(*See* Appellant's Motion for Post Conviction Relief Pursuant to 42 Pa.C.S.A.

§ 9541 *et seq.* ¶ 2). This barren statement hardly constitutes a good faith effort to plead and prove the application of any savings exception in Section 9545(b)(1). Although the PCRA makes clear exactly what Appellant must assert and prove, counsel simply ignored these requirements by providing nothing to support the bold statement of jurisdiction in ¶ 2 of the petition. Thus, Appellant has not carried her burden to save her otherwise untimely petition. *See Fahy, supra.*

■ ¶ 32 Additionally, any suggestion that the federal district court's reasoned decision to retain the case constituted "interference by government officials" is without merit. *See* 42 Pa.C.S.A. § 9545(b)(1)(i). Appellant's judgment of sentence became final on September 30, 1996. The federal district court rendered its decision on April 21, 1997. When the Commonwealth filed an appeal on April 22, 1997, Appellant's counsel was on clear notice that the district court's decision might be reversed and the case remanded for dismissal on the ground of nonexhaustion of state remedies. Counsel still had five months to preserve review under the PCRA, particularly where counsel now had the benefit of the federal proceedings. Therefore, we cannot accept any suggestion that the federal district court's "premature" retention of the case adequately excuses Appellant's delay in filing a PCRA. To the contrary, it was counsel who let the time lapse and by statutory exclusion, counsel cannot be considered under the definition of "government officials" for purposes of excusing the delay in filing Appellant's PCRA. *See* 42 Pa.C.S.A. § 9545(b)(4). Accordingly, Appellant's PCRA petition is deficient in this regard and does not serve to qualify her claims for PCRA relief. *See Fahy, supra.*

¶ 33 We recognize, however, that the Third Circuit Court of Appeals, the PCRA court, the Commonwealth and counsel did not have the benefit of our Supreme Court's decision in *Fahy, supra* when

making their independent decisions and arguments in this case. No doubt, the collective position was that Appellant could rely on principles of comity and equitable tolling to overcome the PCRA time limitations. Thus, the PCRA court permitted counsel to defend Appellant's rights with zeal, bringing to the attention of the court all of the errors that, according to Appellant, caused her an unfair trial. The PCRA court allowed her to reiterate her claims and explore every avenue for relief. The PCRA court demonstrated remarkable patience and thoroughness throughout the proceedings, which provided for review on appeal over eight thousand pages of testimony from trial and the PCRA hearing, along with other filings, as well as the PCRA court's three hundred and twenty (320) page main opinion. Therefore, to preserve the state court's findings,[12] we will outline Appellant's arguments in sequence, and the PCRA court's disposition thereof, under the standards set forth in *Jermyn, supra* and *White, supra.*[13] *See, e.g., Commonwealth v. Travaglia,* 541 Pa. 108, 130, 661 A.2d 352, 363 (1995) (explaining factual determination by federal district court does not "overturn" factual determination made by and subsequently affirmed by state courts, and providing further explanation on already fully litigated and nonreviewable issue, in light of federal court proceedings).

¶ 34 Our scope of review when examining a PCRA court's denial of relief is limited to whether the court's findings are supported by the record and the order

is otherwise free of legal error. *Commonwealth v. Jermyn,* 551 Pa. 96, 709 A.2d 849 (1998); *Commonwealth v. Morales,* 549 Pa. 400, 701 A.2d 516 (1997); *Commonwealth v. Carbone,* 707 A.2d 1145 (Pa.Super.1998). We will not disturb findings that are supported by the record. *Commonwealth v. Yager,* 454 Pa.Super. 428, 685 A.2d 1000 (1996) (*en banc* ), *appeal denied,* 549 Pa. 716, 701 A.2d 577 (1997); *Commonwealth v. Bell,* 706 A.2d 855 (Pa.Super.1998), *appeal denied,* 557 Pa. 624, 732 A.2d 611 (1998). Likewise, the PCRA court's credibility determinations are binding on the reviewing court, where there is record support for those determinations. *Commonwealth v. White,* 557 Pa. 408, 734 A.2d 374 (1999) (citing *Commonwealth v. Abu-Jamal,* 553 Pa. 485, 720 A.2d 79 (1998), *cert. denied,* 528 U.S. 810, 120 S.Ct. 41, 145 L.Ed.2d 38 (1999)).

¶ 35 When deciding an otherwise timely PCRA petition, the initial inquiry is whether the petitioner is eligible for relief. 42 Pa.C.S.A. § 9543. Section 9543 of the PCRA in pertinent part provides:

### § 9543. Eligibility for relief

(a) **General rule.**—To be eligible for relief under this PCRA, the petitioner must plead and prove by a preponderance of the evidence all of the following:

(1) That the petitioner has been convicted of a crime under the laws of this Commonwealth and is:

(i) currently serving a sentence of imprisonment . . . for the crime

\* \* \*

---

**12.** *See Werts v. Vaughn,* 228 F.3d 178 (3d Cir.2000) (stating 1996 amended standards for reviewing state court judgments in federal *habeas* petitions filed under 28 U.S.C. § 2254 increased deference federal courts must give to factual findings and legal determinations of state courts). "Factual issues determined by a state court are presumed to be correct and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence." *Id.* (citing 28 U.S.C. § 2254(e)(1) (1997)).

**13.** We are also aware that our Supreme Court may not have the opportunity to address this action. *See In Re: Exhaustion of State Remedies in Criminal and Post–Conviction Relief Cases,* No. 218 Judicial Administration Docket No.1 (*per curiam* ) (May 9, 2000) (stating effective immediately, following adverse order from Superior Court or Supreme Court of Pennsylvania, petition for rehearing or allowance of appeal no longer required in post-conviction relief matters to exhaust state court remedies for purposes of federal *habeas* proceedings).

(2) That the conviction or sentence resulted from one or more of the following:

(i) A violation of the Constitution of this Commonwealth or the Constitution or laws of the United States which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

(ii) Ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

\* \* \*

(vi) The unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced.

(3) That the allegation of error has not been previously litigated or waived.

(4) That the failure to litigate the issue prior to or during trial, during unitary review or on direct appeal could not have been the result of any rational, strategic or tactical decision by counsel.

42 Pa.C.S.A. § 9543(a)(1)(i); (a)(2)(i), (ii), (vi); (a)(3); (a)(4). The term "previously litigated" means, "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." 42 Pa.C.S.A. § 9544(a)(2).

¶ 36 Generally, claims of trial error are not cognizable under the PCRA where such claims previously have been waived. *Commonwealth v. Williams*, 557 Pa. 207, 732 A.2d 1167 (1999) (citing 42 Pa.C.S.A. §§ 9543(a)(3), 9544(b)). An issue is waived in the post-conviction relief setting if the petitioner failed to raise it when it could have been raised either at trial, on appeal, or in a prior PCRA proceeding. *Williams,*

*supra* (citing 42 Pa.C.S.A. § 9544(b)). The PCRA provides several avenues to overcome waiver, for example, through assertions of constitutional violations, ineffective assistance of counsel, and newly discovered evidence. 42 Pa.C.S.A. § 9543(a)(2)(i), (ii), (vi).

### I.

¶ 37 In her first issue, Appellant presents numerous sub-issues involving allegations of prosecutorial misconduct, claiming she was subjected at trial to the Commonwealth's presentation of false evidence, fabricated evidence, intentional withholding of exculpatory and favorable evidence and disowning of evidence used to convict her. These claims involve specific items of evidence and certain behavior by the Commonwealth, which Appellant concludes was so outrageous, deplorable, and of such constitutional proportion that her conviction must be overturned and retrial barred. Throughout the presentation of each issue, Appellant has woven claims of constitutional violations, ineffective assistance of counsel and assertions of newly discovered evidence in an effort to bring her claims under Section 9543(a)(2)(i), (ii), (vi). Regarding these underlying assertions, we note the following applicable legal principles.

■ ¶ 38 The PCRA provides an action where persons convicted of crimes they did not commit or individuals who are serving illegal sentences may obtain collateral relief. 42 Pa.C.S.A. § 9542; *Carbone, supra.* Under the PCRA, a person may be eligible for collateral relief if she can plead and prove by a preponderance of the evidence that her conviction is the result of the unavailability of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced. 42 Pa. C.S.A. § 9543(a)(2)(vi). "To grant such relief the court must be satisfied that the evidence 'could not have been obtained by reasonable diligence, that it is not cumula-

tive or of such a nature that it merely impeaches credibility, and that it would likely compel a different result.'" *Carbone, supra* at 1148 n. 6 (quoting *Commonwealth v. Galloway*, 433 Pa.Super. 222, 640 A.2d 454, 456 (1994), *appeal denied*, 538 Pa. 666, 649 A.2d 668, *cert. denied*, 514 U.S. 1039, 115 S.Ct. 1407, 131 L.Ed.2d 294 (1995)).

■ ¶ 39 With respect to the *Brady*[14] rule, this Court has explained that suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment. *Commonwealth v. Santiago*, 439 Pa.Super. 447, 654 A.2d 1062 (1994), *appeal denied*, 541 Pa. 651, 664 A.2d 540 (1995), *cert. denied*, 516 U.S. 995, 116 S.Ct. 532, 133 L.Ed.2d 437 (1995). The rule also applies to evidence materially affecting the credibility of a key prosecution witness whose reliability may be determinative of the defendant's guilt or innocence. *Commonwealth v. Moose*, 529 Pa. 218, 602 A.2d 1265 (1992) (citing *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)). *See also Morales, supra* (stating to be entitled to new trial for failure to disclose evidence affecting witness' credibility, appellant must demonstrate that reliability of witness may well be determinative of guilt or innocence).

■ ¶ 40 Additionally, this Court has held that a "conviction obtained by the **knowing** use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment." *Commonwealth v. Romansky*, 702 A.2d 1064, 1067 (Pa.Super.1997), *appeal denied*, 555 Pa. 699, 723 A.2d 670 (1998) (emphasis added) (holding as *Brady* violation prosecution's failure to disclose to

defense that prosecution had agreed not to prosecute key witness in exchange for his testimony at trial). In essence, *Brady* involves after-trial discovery of exculpatory[15] or favorable and material information, which was known to the prosecution but unknown to the defense. *Id.*

> *Brady* is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation. In this regard, the Supreme Court has observed that there is no general constitutional right to discovery in a criminal case, and *Brady* did not create one; ... the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded.... Thus, the rationale underlying *Brady* is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of [her] defense, but to assure that the defendant will not be denied access to exculpatory evidence **only** known to the Government.

The law is clear, therefore, that a prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial. Moreover, the Supreme Court has observed:

> A defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the Commonwealth's files. Although the eye of an advocate may be helpful to a defendant in ferreting out information, this Court has never held—even in the absence of a statute restricting disclosure—that a defendant alone may make the determination as to the materiality of the information. Settled practice is to the

---

**14.** *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**15.** "Exculpatory evidence is that which extrinsically tends to establish defendant's innocence of the crimes charged, as differentiated from that which, although favorable, is mere-

ly collateral or impeaching." *Commonwealth v. Hicks*, 270 Pa.Super. 546, 411 A.2d 1220, 1222 (1979) (holding statement that was merely cumulative, which did not add helpful facts or strengthen claim, is not exculpatory).

contrary. In the typical case where a defendant makes only a general request for exculpatory material under [*Brady* ], it is the State that decides which information must be disclosed. Unless the defense becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final. Defense counsel has no constitutional right to conduct his own search of the State's files to argue relevance.

To establish a *Brady* violation a defendant must show (1) that the prosecution suppressed evidence, (2) that the evidence suppressed was favorable to the defendant or exculpatory, and (3) that the evidence suppressed was material to the issues at trial. Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A rule that the prosecutor commits error by any failure to disclose evidence favorable to the accused, no matter how insignificant, would impose an impossible burden on the prosecutor and would undermine the interest in the finality of judgments.

In determining the materiality of evidence withheld by the prosecution ... an appellate court must view the suppressed evidence's significance in relation to the record as a whole.

*Santiago, supra* at 1068–70 (internal citations and quotation marks omitted) (emphasis in original). Our Supreme Court has further explained:

[M]ateriality is determined by different standards depending upon whether trial counsel made a specific or a general request for exculpatory evidence. For instance, where the defense gives the prosecution notice of exactly what the defense desires, the test of materiality is whether the evidence might have affect-

ed the outcome of the trial. Where ... a general, as opposed to a specific, request for exculpatory evidence is made, the evidence is material "if the omitted evidence creates a reasonable doubt that did not otherwise exist...."

The omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

In determining the materiality of the omitted evidence we must, therefore, consider any adverse effect that the prosecutor's failure to disclose might have had on not only the presentation of the defense at trial, but the preparation of the defense as well.

*Commonwealth v. Green*, 536 Pa. 599, 640 A.2d 1242 (1994). When multiple nondisclosures are alleged, the effect of each nondisclosure cannot only be considered alone; the cumulative effect of the nondisclosures must also be evaluated even if each single nondisclosure might not be in and of itself sufficient to justify relief. *Santiago, supra.*

¶ 41 "The United States Supreme Court has made clear, however, that 'there is no constitutional requirement that the prosecutor make a complete and detailed accounting to the defense of all police investigatory work on a case.'" *Id.* at 1071. "The Pennsylvania Supreme Court has observed similarly that the prosecution is not required to disclose to the defense 'every fruitless lead followed by investigators of a crime.'" *Id. See also Williams, supra; Commonwealth v. Pursell*, 555 Pa. 233, 724 A.2d 293 (1999), *cert. denied*, 528 U.S. 975, 120 S.Ct. 422, 145 L.Ed.2d 330 (1999) (stating Commonwealth does not violate *Brady* rule when it fails to turn over evidence readily obtainable by or known to defendant).

¶ 42 Prosecutorial misconduct includes actions intentionally designed to provoke the defendant into moving for a mistrial or conduct by the prosecution intentionally undertaken to prejudice the defendant to the point where she has been denied a fair trial. *Commonwealth v. Smith*, 532 Pa. 177, 615 A.2d 321 (1992). The double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant subjected to the kind of prosecutorial misconduct intended to subvert a defendant's constitutional rights. *Id.* (barring retrial where evidence proved that prosecution deliberately failed to disclose material exculpatory physical evidence during capital trial, intentionally suppressed evidence while arguing for death sentence on direct appeal, and shifted focus to investigator's role in production of evidence and away from its own role in suppressing evidence). However, *Smith* did not create a *per se* bar to retrial in all cases of intentional prosecutorial overreaching. *Commonwealth v. Simone*, 712 A.2d 770 (Pa.Super.1998), *appeal denied*, 557 Pa. 628, 732 A.2d 614 (1998). "Rather, the *Smith* court primarily was concerned with prosecution tactics, which actually were designed to demean or subvert the truth seeking process." *Id.* at 774–75.

¶ 43 Finally,

[w]hen a petitioner alleges trial counsel's ineffectiveness in a PCRA petition, he must prove by a preponderance of the evidence that his conviction or sentence resulted from ineffective assistance of counsel "which in the circumstances of the particular case so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(iii). We have interpreted this provision in the PCRA to mean that the petitioner must show: (1) that his claim of counsel's ineffectiveness has merit; (2) that counsel had no reasonable strategic basis for his action or inaction; and (3) that the error of counsel prejudiced the petitioner—i.e., that

there is a reasonable probability that, but for the error of counsel, the outcome of the proceeding would have been different. We presume that counsel is effective, and it is the burden of Appellant to show otherwise.

*Commonwealth v. Stevens*, 559 Pa. 171, 180–81, 739 A.2d 507, 512 (1999) (some internal citations omitted). "[T]he PCRA standard is equivalent to the standard on direct appeal claims of ineffective assistance of counsel...." *Commonwealth v. Kimball*, 555 Pa. 299, 311, 724 A.2d 326, 332 (1999) (harmonizing prior case law).

Counsel has a duty to undertake reasonable investigations or to make reasonable decisions that render particular investigations unnecessary. Where counsel has made a strategic decision after a thorough investigation of law and facts, it is virtually unchallengeable; strategic choices made following a less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports the limitation of the investigation. As noted, an evaluation of counsel's performance is highly deferential, and the reasonableness of counsel's decisions cannot be based upon the distorting effects of hindsight.

*Commonwealth v. Basemore*, 560 Pa. 258, 289, 744 A.2d 717, 735 (2000).

## A. The Sweatpants

¶ 44 Appellant asserts that the Commonwealth coached Lawrence Yunkin, to testify at trial that Appellant was wearing his sweatpants at the crime scene, because the Commonwealth had no clothing belonging to Appellant with any blood on it. Appellant complains that the Commonwealth had Yunkin change his story and testify that Appellant had worn Yunkin's oversized black sweatpants to the scene instead of her own clothing. She concedes that her attorney strenuously cross-examined Yunkin and later argued against this contention at Appellant's 1992 trial and in post-trial motions. Neverthe-

less, Appellant asserts the trial court in 1992 must have necessarily found Yunkin's testimony credible and that she had worn his clothing because she was six months pregnant. In support of her contention, she cites to the trial court's opinion, dated July 19, 1994, at 14, which states:

In addition, [Appellant] points to the testimony about the clothing worn at the time of the killing. She argues that no satisfactory explanation was given for the fact that Mr. Yunkin's clothing was worn by someone involved in the killing and that a portion of Mr. Yunkin's wardrobe, i.e., the [hooded sweatshirt] was discarded in the river and not recovered by the police.

First of all, for [Appellant] to argue that the killer was wearing Mr. Yunkin's clothing, and, therefore, must have been Mr. Yunkin is ludicrous. There was credible testimony that [Appellant] wore clothing of Mr. Yunkin on the day of the murder. For any number of reasons, [Appellant] could have chosen to wear Mr. Yunkin's clothing. For one, [Appellant] was six months pregnant at the time of the killing. The fact that his clothing may well have been worn by the killer does not mean that Mr. Yunkin was the killer. The court listened to the testimony regarding the clothing, observed the size of the garments and the size of the people involved, i.e., [Appellant], Ms. Buck and Mr. Yunkin, and found there to be no question raised by the fact that the clothing appeared to be Mr. Yunkin's.

The single most important fact on the issue of guilt is whether [Appellant] was present in the Show condominium at the time of the killing. By her own admission, she was present. Her story changed somewhat at trial but she was at least on the premises, according to her version, and well aware that violent, vicious and life threatening acts were going on inside the condominium.

(*See* Trial Court Opinion, dated July 19, 1994, at 14–15). Appellant concludes that

the trial court must have believed Yunkin's testimony in reaching these conclusions, although his testimony was contrived. She insists that the Commonwealth intentionally presented his testimony for the purpose of denying Appellant a fair trial. We cannot agree.

■ ¶ 45 Addressing this issue in its 1998 opinion, the PCRA court stated:

The black sweatpants were of relatively little value to this court as the fact finder in 1992. Today, they play a leading role in [Appellant]'s post conviction drama. In 1992, the issue of the black sweatpants was simple. Mr. Yunkin testified that [Appellant] wore them on the morning of the murder, but that they were his sweatpants. [Appellant] told Corporal Solt that she was wearing black sweatpants at the time of the murder. The only real question was whether she could have worn sweatpants owned by the larger [Yunkin]. This was resolved by the court's observation that [Appellant] could certainly have worn the garment [shown at trial].

Today [Appellant] contends that Mr. Yunkin's testimony about [Appellant] wearing his clothing was false and perjured testimony. Further, [Appellant] contends that some time between the 1992 trial and the 1997 federal *habeas* hearing, the Commonwealth "switched" a [smaller pair of sweatpants] for the men's extra large sweatpants admitted into evidence in 1992 ... [and] that the bloody sweatpants, sized men's extra large, were destroyed by the Commonwealth and a smaller pair substituted. The analysis can begin, and should end, with the observation that there was no charge of misconduct regarding the black sweatpants in the 1992 trial. [Appellant] can point to no fabrication, alteration, modification or destruction of any evidence regarding any item of clothing at or before the 1992 trial. [Appellant]'s **only contention** with respect to the 1992 trial is that Mr. Yunkin's testimony about [Appellant] wear-

ing his clothing must have been false and, therefore, the Commonwealth offered perjured testimony in support of the conviction.

(*See* PCRA Court Opinion, dated August 24, 1998, at 204–05) (emphasis in original). The PCRA court reviewed the 1992 record for references to Appellant's attire, including Appellant's statements to the police, which Appellant claimed she had made to cover up for Yunkin. The PCRA court also compared Appellant's prior statements to her trial testimony. Then the court reviewed Yunkin's trial testimony regarding the sweatpants, which tested positive for the presence of blood. The court summarized:

> None of this testimony appeared particularly pivotal at the 1992 trial. The black sweatpants were never mentioned in [either party]'s opening statement. The sweatpants were not mentioned in [the prosecution]'s closing argument.... [Defense counsel] argued that the sweatpants were worn by Mr. Yunkin ... that the more likely wearer of the sweatpants was Mr. Yunkin and that this suggested that Mr. Yunkin was in the condominium that morning and participated in the murder.
>
> *    *    *
>
> There is absolutely no merit to the contention that Mr. Yunkin's testimony about [Appellant] wearing his clothes was false or perjured. We found this to be believable in 1992 and nothing we have learned or heard since that time changes that opinion.

The controversy over the black sweatpants arose at the federal *habeas* hearing. In [Appellant]'s amended *habeas* petition she refers to "Yunkin's grossly oversized clothing that would have severely impeded her movements...." [Appellant]'s characterization of the black sweatpants as "grossly oversized clothing" appeared to be at odds with the size of the sweatpants, which were produced to [Appellant] by the Commonwealth. These sweatpants, according to the Commonwealth, were the same sweatpants as were admitted into the 1992 trial as Commonwealth's Exhibit 9. Armed with the **assumption** that Commonwealth's Exhibit 9 was, in fact, a grossly oversized pair of baggy black sweatpants and faced with a pair of black sweatpants which do not appear to be "grossly oversized," [Appellant]'s counsel leaped to the conclusion that the sweatpants were "switched."

(*See id.* at 209–14) (emphasis in original). Comparing the evidence presented at the PCRA hearing, including the testimony of (1) trial defense counsel; (2) defense textile expert, comparing the sweatpants offered at the PCRA hearing with a photograph of the sweatpants which was taken in 1992 by defense counsel; (3) the Commonwealth's investigator Lt. Renee Schuler, concerning the 1992 evidence log listing the contents of a trash bag found at the incinerator on the day after the murder as including a pair of "ladies 'black' sweatpants (appears small size)"; (4) Donald Bloser, who performed blood testing on the sweatpants in 1992, identifying his markings which, although faded, appeared on the sweatpants offered at the PCRA hearing; and (5) the Commonwealth's identification of the sweatpants offered at the PCRA hearing as the same sweatpants that became its Exhibit 9 at trial, the PCRA court stated: "We found no evidence to suggest that the sweatpants were 'switched.'" (*Id.* at 213). The court concluded:

> Even if we assume the sweatpants were "switched" during the *habeas corpus* hearing, that does nothing to establish after-discovered evidence, prosecutorial misconduct or ineffective assistance under the PCRA. Even if the sweatpants had been "switched" in 1997, this is not a fact that would have changed the outcome of the 1992 trial nor did it so undermine the truth-determining process in 1992 that no reliable verdict was possible. [Appellant]'s counsel would simply disagree with this court's conclu-

sion that [Appellant] could have worn the sweatpants offered into the record in 1992. They were not present at the trial. This court was present and concluded on the record that it was possible for [Appellant] to have worn these sweatpants.

\*    \*    \*

If the federal district court found that the sweatpants were "switched" during the [*habeas* ] proceeding, then it had every right to be concerned. But the concern would have been for the Commonwealth's conduct during the *habeas* hearing, not for the effect switching the sweatpants in 1997 would have had on the 1992 verdict. We simply do not have any conclusive evidence in this record which would establish that the sweatpants were switched. We further find · that argument is of no legal significance to this PCRA case even if it would have factual support. We looked at what was available to this court in 1992 and whether after-discovered evidence regarding the **integrity of the evidence in 1992** is now available to this court. We considered whether presentation of the sweatpants as evidence in 1992 was the result of prosecutorial misconduct. We find neither to be the case. Therefore, we find that the issue of the black sweatpants has *no bearing* on [Appellant]'s post-conviction claim.

(*Id.* at 213–14) (emphasis in original). The court's conclusions and credibility determinations are supported by the record. *See Jermyn, supra; White, supra.*

### B.   The Crime Scene Photographs

■ ¶ 46 Appellant next claims that the police altered the crime scene and fabricated crime scene photographs to discredit her version of what happened in the Show condominium on the morning of December 20, 1991. Specifically in this appeal, Appellant argues that the crime scene photographs were altered to depict a telephone cord wrapped around the victim's ankle in an effort to create an incon-

sistency in Appellant's story. She also asserts that the photographs depict the victim as lying at an angle from the closet whereas the testimony of Appellant, Tabitha Buck, and EMT Ken Zeyak describe the position of the victim's body as "more parallel to the closet." Appellant refers to the testimony of Trooper Reeves to support her contention that the crime scene photographs are false. Appellant concludes that the trial court disregarded voluminous evidence that the police faked the photographs of the victim's body to secure Appellant's conviction.

¶ 47 In addressing Appellant's contention regarding the telephone cord, the PCRA court stated:

A series of crime scene photographs show a telephone cord wrapped around the leg of [the victim]. [The victim's] body was positioned in her bedroom and a number of photographs show the cord connecting a handset to the base of the telephone wrapped once around her leg down near the ankle. Why is this of significance? First, because the [crime scene drawings/diagrams] ... do not show the telephone cord wrapped around the leg of the victim. Second, [Appellant] testified at trial that Ms. Buck grabbed the telephone from [the victim]'s hand and threw it across the room.... In essence, [Appellant] believes that the police wrapped the telephone cord around the leg of the victim in an intentional act to discredit her story. [Appellant] attempts to discredit the crime scene photographs by pointing to the crime scene diagram prepared by Officer Weaver.

Officer Weaver testified that he did not prepare the diagram to scale, that there were literally hundreds of items in the bedroom and that he did not record the location or the description of each and every item. The telephone was placed in the diagram after the body was removed from the bedroom. In fact, he was preparing these diagrams essentially to show the position of the body and

the major articles of furniture in the bedroom. This was the first homicide investigation in which he had been involved and the first crime scene he had drawn. In his testimony, he did not seem to attach much, if any, significance to the precise location of these various objects.

(*See* PCRA Court Opinion at 234–35). Upon the questioning of almost every witness present at the crime scene, no one was able to specifically recall whether the telephone cord was wrapped around the victim's leg. The PCRA court noted that the position of the telephone cord was of questionable relevance at best. As the PCRA court remarked, this allegation of misconduct assumes the police took every detail of Appellant's statement given in the early hours of December 21, 1991, the day following the murder, and sought to reorchestrate the evidence from the crime scene to discredit that statement. More than just a few of Appellant's allegations of photograph fabrication involve orchestration of evidence based on information about which the police knew nothing when the photographs were taken.

¶ 48 Contrary to Appellant's contention, the PCRA court considered all the evidence, including Appellant's most exaggerated and preposterous suppositions and extrapolations. Further, we note, Trooper Reeves never testified that the crime scene photographs were false. Instead, he stated only that he would not answer any questions related to the photograph offered by Appellant's counsel during the PCRA proceedings unless the photograph was first authenticated, and as between the unauthenticated photograph and the authenticated crime scene drawing, he preferred to rely on the authenticated crime scene drawing. Appellant's assertion on appeal constitutes a mischaracterization of Trooper Reeves' testimony.

¶ 49 Additionally, whether the victim's body was lying parallel to or at an angle to the closet does not prove that the photographs were altered. Indeed, if the victim's body had been moved, then it could have been moved by any one of a number of persons on the scene, including the victim's mother or one of the emergency medical crew, before the pictures were taken. The change in position of the victim's body as offered by Appellant does not necessarily prove misconduct.

¶ 50 The PCRA court also determined that the crime scene photographs were available to defense counsel at Appellant's 1992 trial, stating:

As to the issue of after-discovered evidence, the crime scene photographs were certainly available to [defense counsel] in 1992. The crime scene drawings prepared by Officer Weaver were available as well. In fact, Officer Weaver took the stand in 1992 and was cross-examined.... If any discrepancy between the photographs and the drawing were of any importance to [Appellant's] defense, they would have been raised at that time. This is certainly not evidence, which was unavailable at the time of trial.

(*See id.* at 237). The court correctly concluded that the unsubstantiated accusation of altered photographs does not constitute after-discovered evidence. *See Carbone, supra; Galloway, supra.*

## C. The Commonwealth's Brady Violations

¶ 51 Appellant next claims that the Commonwealth failed to disclose an interview with Kathleen Bayan, a resident of the victim's condominium complex. Bayan gave a statement on July 7, 1992, in which she said that she had seen Yunkin, Buck and Appellant in a car inside the condominium complex on the morning of the murder. The significance of this witness, according to Appellant, is that defense counsel could have used her testimony at the 1992 trial to rebut Yunkin's testimony that he was not inside the complex and thereby challenge his credibility. Appellant contends that the Commonwealth intentionally deprived Appellant of

this testimony. She claims Bayan's testimony went to the "heart of counsel's defense" and would have been of such "extreme importance" that counsel would have doubtlessly called Bayan to testify at trial. Appellant concludes that this testimony was favorable and material to her defense because it is consistent with her story.

¶ 52 In response, the PCRA court has stated:

The prosecution's failure to disclose the information supplied by Ms. Bayan in no way violated the due process rights afforded by *Brady* and Pa.R.Crim.P. 305.

\* \* \*

Kathleen Bayan observed a great deal of detail from her vantage point in her own car while the car in question flashed past her. She indicated that there was an argument going on and recalls the color of the car, the color of the driver's hair and a description of the passengers. She offered no explanation for not coming forward with that information between December 1991 and July 1992. This fact in and of itself would not be fatal to her credibility but it does raise a question. She had ample opportunity to read newspapers, become acquainted with the facts of the case and come to know the details of the description of the participants long before July 1992.

In addition, she did not immediately tell Detective Savage of her observations.[16] Only after a lengthy discussion of other personal issues, did she offer her observation of what she had seen.

\* \* \*

Ms. Bayan's credibility was somewhat diminished in her testimony ... on cross-examination. She acknowledged that she has a visual handicap. This handicap affects her ability to perceive objects other than that specific object on which she focuses. That is ... if she looks at one object, she cannot see the details of anything else surrounding that finite discreet item. This suggests that perhaps if Ms. Bayan was looking at the long curly hair of the driver of the brown car ... she was unable to see the occupants. Or, if she was observing the make and color of the car, perhaps she was unable, due to her handicap, to see the occupants.

\* \* \*

There are two important credibility points regarding Ms. Bayan's testimony. First, by the court's observation of her as she testified,[17] she appeared less than completely credible as she answered the questions. The court is not surprised that Detective Savage, upon his interview with her in July 1992, found there to be problems with her credibility.

The second and more important issue as to Ms. Bayan's credibility has to do with the contention that she was unable to travel to Pennsylvania. As we learned later in the hearing, Ms. Bayan has an active warrant for her arrest in the offices of District Justice Savage, formerly Detective Savage.[18] This warrant arises out of her failure to pay certain county tax obligations while she was a resident of Lancaster County.... Ms. Bayan was sued twice before by the taxing authority, permitted the obligations to go to judgment, and satisfied

16. Ms. Bayan gave her observations to Detective Savage when he came to her condominium in July 1992 to ask Bayan where her son was on the morning of the murder, as witnesses had reported a number of young people at or around the school bus stop near the condominium entrance.

17. Ms. Bayan testified *via* video teleconference. She claimed she was unable to travel

from Florida to Pennsylvania because she provides the sole support of and transportation for her disabled fiancé.

18. The court noted that District Justice Savage's office has jurisdiction over the area where Ms. Bayan resided; the fact that the warrant issued from that office was coincidental.

the prior two obligations upon the issuance of warrants.

(*See* PCRA Court Opinion at 165–71). In discussing whether the Commonwealth violated *Brady* or Pa.R.Crim.P. 305 with respect to the nondisclosure of Ms. Bayan's statement, the court stated:

When [Appellant] changed her story at trial, [the Commonwealth]'s obligation was the same: to disclose evidence that was exculpatory. Ms. Bayan's statement was not exculpatory merely because [Appellant] calls it exculpatory. It is true that Ms. Bayan's statement, if credible, would support some part of [Appellant]'s trial testimony. Ms. Bayan's statement would support only [Appellant]'s description of how she fled that morning. Yet, [Appellant]'s own testimony put her in flight from the [Show] condominium after participating in an assault which led to a murder. Her trial testimony established that she was deeply involved in the conspiracy and the murder. Ms. Bayan's statement might have been inculpatory to Mr. Yunkin but [it was] not exculpatory to [Appellant].

(*See id.* at 173–74). The PCRA court concluded that the Bayan statement was not material information under *Brady* or Pa.R.Crim.P. 305, and the statement would not have changed the outcome of the trial. (*Id.*) The court continued:

This court finds that even if Ms. Bayan had testified at trial, even if [Appellant] had the support of Ms. Bayan for her revised story that Mr. Yunkin was in the complex, the verdict would have been the same.

We did not find Kathleen Bayan credible at the PCRA hearing. We find [Appellant]'s statement to Corporal Solt of how she fled, Ms. Buck's testimony of how they fled together, Mr. Kleinhans' testimony about seeing two hooded figures of about the same size heading away from the condominium, and the observations of Mr. and Mrs. Fry, to be convincing and credible on this point. Because it is

contrary to overwhelming credible evidence, her story would have no impact.

\*    \*    \*

In fact, [Appellant]'s contention that Ms. Bayan saw [Appellant, Buck and Yunkin] in the complex that morning cannot be reconciled with [Appellant]'s contention that Mrs. Show saw them as well. [Appellant] would have this court believe that Mrs. Show left the school at 7:25 a.m. per Ms. Berry. Testimony has shown that the trip from the school to the complex takes approximately ten minutes. If Mrs. Show saw the three that morning, it would have been around 7:35 a.m. [according to Appellant's time line]. Yet, Ms. Bayan testified that she saw them as she left for Harrisburg between 7:10 a.m. and 7:15 a.m. This internal inconsistency in [Appellant]'s case lends further support to our finding that Ms. Bayan's testimony would not have changed the outcome of the trial. Nor does it have any impact on the reliability of the verdict.

(*See id.* at 175–76).

¶ 53 With respect to Ms. Berry's statement, Appellant complains that the Commonwealth deliberately failed to disclose the police interview with Patricia Berry, the school secretary. According to Appellant, Berry told police that she had seen the victim's mother leave the school at 7:25 a.m. The significance of the time mentioned in Berry's statement goes to discredit the testimony of Mrs. Show, the victim's mother, and calls into question the entire chain of events as described by her at the 1992 trial. In addressing this claim, the PCRA court stated:

The [police] report reflects that there was a conversation between Mrs. Show and a secretary and certainly the identity of the secretary could have been easily determined had defense counsel chosen to contact Conestoga Valley [school]. This was not a *Brady* violation. [Defense counsel] was aware from the January 2, 1992 report that Mrs. Show spoke

to a secretary immediately before leaving the school. The report was among the documents produced to him in discovery. In her testimony, Ms. Berry testified that Mrs. Show left the school at "approximately 7:25 a.m." It was necessary for Ms. Berry to review the police report to refresh her recollection. She did not recall looking at the clock. She admitted: "I don't remember anything definite about what time she left." She recalls that Mrs. Show left prior to the arrival of the secretary who gets in at 7:30 a.m. This is far from precise. It is the best recollection available to Ms. Berry and her testimony was credible to this court. Did the secretary who gets in at 7:30 get in five minutes early or five minutes late? Did Mrs. Show leave ten minutes before that secretary arrived? Fifteen minutes? Five minutes?

From the various times described by various witnesses in 1992 and at the 1998 PCRA hearing, it is likely that many of these times were approximations and estimates. There is no evidence that all relevant parties had coordinated their watches or any testimony that each was going by a certain clock. The only time that appears to be in any way certain was the time the 911 call was received by Lancaster Wide Communications, that is, 7:35 a.m. Given the fact that Ms. Berry's testimony about time was an approximation and given the fact that there are variables affecting the time line that morning, Ms. Berry's testimony as presented to this court in the PCRA hearing was not material in the sense that there is no showing that it would have changed the outcome of the case in 1992.

(*See id.* at 279–81). We conclude the PCRA court properly applied the relevant legal principles to these issues when it determined that they warranted no relief. *See Jermyn, supra; Morales, supra; Carbone, supra.*

### D.   The "29" Questions

■ ¶ 54 Next, Appellant claims that the Commonwealth relied on Mr. Yunkin's perjured testimony at her 1992 trial during his testimony about the "29 questions." The "29 questions" is a document created by Appellant and Yunkin at the Lancaster County Prison sometime between their arrest and Appellant's trial. Appellant contends that Yunkin's testimony at her 1992 trial was "clearly perjured" on two points. According to Appellant, Yunkin lied when he insisted that: (1) the word crossed out in his answer "I remember seeing [name crossed out] dead" was the word, "Tressa" and not the word, "Laurie"; and (2) the questions posed by Appellant on this document had been written in pencil and had been altered. Meanwhile, experts for both the defense and the Commonwealth agreed that there were neither pencil graphite nor erasures on the document. Appellant insists that the Commonwealth's invitation to the trial court to believe some, all, or none of Yunkin's testimony was misconduct. She further insists that the Commonwealth's argument led the trial court to reject the "29 questions" document, which she claims exonerated her. Appellant also accuses the PCRA court of making up facts through speculation. (Appellant's Brief at 24).

¶ 55 In addressing this claim, the PCRA court stated:

How can a document which was of no consequence to the fact finder in 1992 take on significance six years after the trial? [Appellant] contends that certain after-discovered evidence gives [the document] added weight and points toward the culpability of Mr. Yunkin and away from the culpability of [Appellant]. The after-discovered evidence is the fact that Lawrence Yunkin was probably not truthful and forthcoming in his testimony about the "29 questions" in the 1992 trial.

That would have, perhaps, some significance to this court as the fact finder in the PCRA context had the court given

any weight to Mr. Yunkin's testimony in the first instance. The court made clear in its opinion on the post verdict motions that it did not find Mr. Yunkin credible and had many reservations about the veracity and reliability of the "29 questions." [*See* Trial Court Opinion, dated July 19, 1994, at 11–12.]

All Mr. Yunkin said about those questions and answers is that he remembered a similar document, that he recalled the questions being written in pencil and that he wrote answers in pen. (N.T. Trial, 7/10/92, at 274–79) He believed that the document marked ... Defendant's Exhibit 5 at the 1992 trial was not the document on which he actually wrote. (*Id.* at 276)

At the 1992 trial, the defense produced ... a handwriting expert who examined the document. He offered his opinion that the document contained no erasures and no graphite, indicating that there had been no pencil writing on the document. (*Id.* at 869) [The Commonwealth] stipulated to this testimony on the basis that he had the document examined by a Pennsylvania State Police document examiner as well. (*Id.* at 888–89) There was never any effort by the Commonwealth to hide what Mr. Yunkin said or somehow bolster what Mr. Yunkin said with expert testimony. [The Commonwealth] freely and openly acknowledged that his expert's analysis of the document was consistent with the defense expert and these expert opinions were both inconsistent with Mr. Yunkin's testimony.

[The Commonwealth] made the appropriate argument that these facts went to the veracity of Mr. Yunkin and the reliability of the document. [The Commonwealth] further argued that the court was free to accept all, part, or none of the document and the testimony regarding the document. (*Id.* at 1231–32)

In 1992 and today, this court assessed the "29 questions" as inherently suspicious and of very little help to the fact finder.... To say this document is a "confession" by Mr. Yunkin is simply wrong. This is a document which contains answers which are barely responsive to the questions. The questions contain words which are crammed in the spaces and the questions are, if nothing else, entirely self-serving.

\*     \*     \*

The "29 questions" does not take on the stature of after-discovered evidence simply because a federal judge disagreed with a state judge's analysis of the document's importance. Perhaps the "29 questions" would have raised a reasonable doubt to the federal judge and perhaps, standing alone, this inherently unreliable document would have served as the basis for his conviction of Mr. Yunkin.

The reality of this case is that the "29 questions" was fully and well considered in the 1992 trial.... Subsequent discussions of that document have not changed this court's mind as to its importance in 1992 or today.

[The Commonwealth] never hid [its] belief that Mr. Yunkin was not being forthright about that document. In truth, no one involved in the 1992 trial could quite figure out who wrote what on that document and what it meant.

\*     \*     \*

With respect to the "29 questions," all [Appellant] can say is that Mr. Yunkin testified in a way that was disputed by expert testimony. This argument goes to the weight of Mr. Yunkin's testimony and the court gave little weight to Mr. Yunkin's testimony.

Subsequent developments, i.e., the appearance of [Appellant]'s Exhibit 1474 would suggest that Mr. Yunkin may well have not perjured himself with respect to the "29 questions." It is not clear that there was more than one document passed between [Appellant] and Mr. Yunkin.

\*     \*     \*

For the purposes of analysis of the evidence in this case, the "29 questions" was and remains an unreliable, inconclusive document. At best, it would have established a reasonable doubt. This court found that it did not and that finding has not been assailed by anything other than sound and fury, signifying nothing.

(*See* PCRA Court Opinion at 116–21).

### E. Officer Reed's Taking the Fifth

■ ¶ 56 In this subsection of her brief on appeal, Appellant directs our attention to the testimony of Officer Reed, a former member of the East Lampeter Township Police, who asserted his Fifth Amendment privilege rather than respond to questions concerning the criminal investigation and prosecution of Appellant. She suggests that the PCRA court erred when it allowed Officer Reed to assert his Fifth Amendment privilege, although the court had previously stated it would direct the witness to respond to non-Fifth Amendment matters. The significance of this error to Appellant is that the court allegedly acted arbitrarily when directing the witness to answer.

¶ 57 In addressing this issue, the PCRA court stated:

Robert S. Reed was called as a witness by [Appellant].... Two days before that, he had been convicted of several felonies involving sexual assaults on minors. At least two of these charges carried with them mandatory minimum sentences of five years each.

When Mr. Reed came into the courtroom, he stated his name and then indicated that he did not wish to answer questions. He was given an opportunity during a recess to consult with his attorney and then returned to the witness stand. At that time, the following colloquy occurred:

THE COURT: Mr. Reed, you indicated a few moments ago that you did not wish to answer any questions until you had a chance to speak to your attorney. Is that correct?

THE WITNESS: That's correct, Your Honor.

THE COURT: All right. Have you had a chance now to speak with your attorney?

THE WITNESS: Yes, I did, Your Honor.

THE COURT: All right. Is that Attorney Robert Reese?

THE WITNESS: That's correct.

THE COURT: Having spoken with Mr. Reese, do you wish to answer questions at this time?

THE WITNESS: No, I do not.

THE COURT: And why is that, Mr. Reed?

THE WITNESS: At this time, I'd just like to reserve that for a later time, Your Honor. I have no explanation at this time. I just don't want to answer any questions.

THE COURT: Okay. Mr. Reed, is your refusal to answer any questions today motivated in any way by a concern against self-incrimination?

THE WITNESS: No, Your Honor.

(N.T. PCRA [Hearing] at 1539–40)

At that point, a conference was held at sidebar with counsel. Counsel discussed with the court whether there was a legitimate Fifth Amendment privilege which could be invoked by Mr. Reed. The court then explained to Mr. Reed that if he refused to answer a question, the court could direct him to answer and his failure to comply could result in a contempt citation. The court further advised him that if it was a matter of self-incrimination, he could invoke his rights under the Fifth Amendment of the United States Constitution and, if satisfied that there was a basis on which to invoke the privilege, we would not direct him to answer the question.

Our research on this issue during the [hearing] disclosed that a witness' right to invoke the Fifth Amendment extends

to potential criminal liability that is collateral or remote. This court was aware that Officer Reed was one of the police officers whose conduct was condemned by the federal district court in 1997 and who was referred to the United States Attorney's Office for investigation. This court has no idea as to the status or progress of any such investigation. However, the fact remained on May 11, 1998, that there was a potential open investigation in the United States Attorney's Office in the Eastern District of Pennsylvania and that answers to any questions put to Mr. Reed during the PCRA hearing could have a bearing on his culpability on any charges or allegations being investigated by the United States Attorney. This court honestly believed that the privilege would apply even if the possibility of investigation, charges or conviction in federal court was remote.

\* \* \*

We ruled that it was proper for Mr. Reed to invoke the Fifth Amendment privilege in light of the allegations made in the federal proceeding. The question remains for our purposes, what is the remedy? [Appellant]'s counsel argue that we should draw an adverse inference to his assertion of the Fifth Amendment privilege on each question. The Commonwealth contends that Mr. Reed should be considered "unavailable" and that his testimony in the federal proceedings should be used as his testimony in this proceeding.

Generally, the fact finder may not draw an inference from a witness' exercise of his constitutional right not to incriminate himself regardless of whether the inference is favorable to the prosecution or the defense. *Commonwealth v. Greene* 445 Pa. 228, 231, 285 A.2d 865, 867 (1971). In this case, the initial colloquy with Mr. Reed disclosed that he was not so much concerned about self-incrimination as he was simply unwilling to participate in the hearing. Given his apparent state of mind following the conviction on the sex offenses, this was understandable. With the explanation given to him as to his options in answering questions, it appears that Mr. Reed used the Fifth Amendment privilege against self-incrimination as a "ticket" not to answer any questions. He appeared hostile to the proceedings and, at one point, refused to look at river search videotape which was played directly in front of him and about which he was asked some questions. The court noted for the record that Mr. Reed did not look at the television screen for the entire eight minutes it took to play the video. It appears that Mr. Reed may well have been angry with himself or at the world. In any case, this led to a wholesale lack of cooperation with counsel's questions.

Given the circumstances and in light of *Greene*, it seems appropriate to consider Mr. Reed "unavailable." We have, therefore, considered his testimony from the federal proceeding, which was presented Monday, April 14, 1997, the tenth day of the *habeas corpus* hearing.

(*See* PCRA Court Opinion at 253–57). The factual determination that Officer Reed was wholly unwilling to participate in the hearing is supported by the record. *See Commonwealth v. Collins,* 420 Pa.Super. 358, 616 A.2d 1012, 1014 (1992) (restating, if witness intends to claim Fifth Amendment privilege as to essentially all questions, [then] court may, in its discretion, refuse to allow witness to take stand; neither side has right to benefit from any inferences [fact finder] may draw simply from witness' assertion of privilege). Pursuant to *Greene, supra* and *Collins, supra,* the court properly denied the adverse inference requested on behalf of Appellant.

## F. The Supposed "Dying Declaration"

### (1) The Dying Declaration Was Scientifically Impossible.

█ ¶ 58 This issue involves a challenge to the testimony by Mrs. Show and

several expert witnesses that the victim named Appellant as her killer. Mrs. Show testified at the 1992 trial and again before the PCRA court that her daughter said, "Michelle did it." Appellant claims, however, that the evidence before the PCRA court proved the victim's alleged statement was "scientifically impossible." Appellant maintains that the dying declaration was medically impossible for two important reasons. Essentially, Appellant argues that both of her medical experts were more qualified. Moreover, contrary to the medical autopsy report relied upon by the Commonwealth, Appellant asserts that her experts determined that the victim's carotid artery appeared to have been severed. Appellant concludes the PCRA court erroneously accepted the testimony supporting a dying declaration.

¶ 59 In analyzing this issue, the PCRA court carefully examined all of the expert testimony provided at the 1992 trial and the PCRA hearing. Appellant produced Charles R. Larson, Ph.D., who testified on the mechanisms of speech.

¶ 60 With respect to this witness, the PCRA court noted:

> He made a thorough and interesting presentation on how the various structures of the neck and mouth and respiratory system work together to produce speech. He offered this as a prelude to his expert opinion that it was not possible for [the victim] to articulate intelligible speech. Dr. Larson contends that it was not possible for [the victim] to say "Michelle did it." He offered this opinion without ever having had the opportunity to observe the structures in [the victim]'s neck and relied exclusively on crime scene and autopsy photographs, the autopsy report and testimony at the various prior hearings.
>
> Dr. Larson also offered an opinion that the left carotid artery on [the victim] was severed. Dr. Larson, whose knowledge of human anatomy, albeit well articulated and detailed, is limited to charts, diagrams, photographs, transpar-

encies, past experience performing experimental surgeries on live monkeys and, apparently, the occasional experiment with a cadaver, was called to offer an opinion as to the integrity of the anatomy of a crime victim whom he never observed.

\* \* \*

> Dr. Larson appeared to this court to be knowledgeable about the speech process. He could say what would happen if a certain portion of the vocal tract is impaired or destroyed. He could not, however, testify with any expertise about what actually might happen to the structures effecting the vocal tract given certain physical injuries. His knowledge in this area is only theoretical. He must make certain assumptions about the impact of certain trauma on the vocal tract. With these assumptions, he can then conclude what the possible effect on the victim's ability to form words, syllables or sounds might be. Perhaps if Dr. Larson's analysis of the mechanisms of speech had been supported by credible and persuasive medical testimony, his opinion and explanation might have been more helpful to the court. The medical witnesses offered by [Appellant] did not provide the necessary medical support for Dr. Larson's theoretical explanations of the process of human speech.

(*See* PCRA Court Opinion at 101–03) (most internal citations omitted).

¶ 61 Appellant also offered the expert opinion of Michael M. Baden, M.D., a forensic pathologist. The Commonwealth originally contacted him, but decided not to call him as a witness after receiving his report. The Commonwealth disclosed his report to Appellant who then called Dr. Baden to testify.

¶ 62 In reviewing Dr. Baden's testimony, the PCRA court stated:

> His opinion, in essence, was that [the victim] would have died within a few minutes of receiving her wounds. He felt she would have had to lose con-

sciousness within three minutes and suffer brain death within two minutes after that. If her left carotid was severed, she would have lost consciousness within a minute or so.

There are several troubling aspects to Dr. Baden's evaluation. His report referred to the victim of this case as Lisa Michelle Lambert.[58] Dr. Baden also opined from his review of the autopsy report and testimony relating to the autopsy that there was no dissection of the neck [of the victim]. He believes there was an obligation to dissect the neck. In fact, the testimony of the physicians who performed the autopsy, and the physicians who took time to review the autopsy report, was that the larynx and the trachea were dissected from the neck and the carotid examined. While it does not appear that the carotid artery was taken apart, piece by piece, while it lay inside the neck of the victim, it was dissected and tied off. It was Dr. Penades [the pathologist who performed the autopsy] who noted upon examination of the carotid artery after the neck had been dissected that the carotid was not cut and that it was intact. (N.T. Trial, [7/9/92,] at 96) How Dr. Baden could offer an opinion as to the autopsy procedure and the integrity of the carotid artery in light of this clear testimony and statement in the report defies belief. He created the impression for this court that his analysis may well have been hurried in the midst of other pressing matters.

---

[58] In fact, he testified that he did not review the report and noted that he really meant to say that the victim was Laurie Show.

Dr. Baden focused more on the cause of death and the time of death in relation to the time of the infliction of the injuries. He gave a range of time within which [the victim] would have lived given certain assumptions as to the nature and extent of the injuries to her neck. He specifically noted that he could not tell from the autopsy photographs whether the carotid artery was severed. He made the statement that an EMT would be in a better position to form an opinion as to the carotid artery given the EMT's opportunity to observe the injury at the scene. He offered no support for this belief. Dr. Baden appeared to this court to beg the issue of whether the carotid artery was, in fact, cut by deferring to the observation of the EMT, Ken Zeyak, who testified earlier in the hearing. Later in the hearing, Dr. Levin, a throat surgeon, testified that medical students and medical residents who observe neck surgery are often unable to pick out the structures in the neck and throat area without guidance from a more experienced physician.

We believe it is likely that Dr. Baden was attempting to be respectful of other witnesses in this proceeding and that his choice to "defer" to the EMT testimony was, in reality, a way of saying that he … could not tell whether the carotid was cut. Dr. Baden did not offer an in-depth discussion of the impact of the neck wounds of [the victim] on her mechanisms of speech. This would have been the medical testimony necessary to give support and credence to Dr. Larson's explanation of the speech processes. Dr. Baden provided no significant medical support for Dr. Larson's opinion regarding the mechanisms of speech involved in this case.

(*See id.* at 103–06) (most internal citations omitted).

¶ 63 Additionally, Appellant offered the testimony of John E. Smiaiek, M.D., chief medical examiner for the State of Maryland. According to Dr. Smiaiek, the victim died from the stab wound to her back, and that she was already dead when her throat was cut. In response to this opinion, the PCRA court noted that the opinion was implausible given the other evidence in the case. The court stated:

We know that the throat was cut before [the perpetrators] left the condominium

and we know that [the victim] demonstrated signs of life to a number of personnel, medical and otherwise, that morning. Charles Robert May noted faint ventricular fibrillation, goose bumps and lip movement. Lisa Hinkle Billiter observed ventricular fibrillation some time after Mr. May, and Mrs. Show observed [the victim] communicating the identity of her killer. For Dr. Smialek to be believed, all three of these other witnesses would have to be completely disbelieved.

Dr. Smialek offered an interesting medical view of an alternative scenario. He did, however, note that it was impossible to tell from the autopsy photographs whether the carotid artery was severed. Dr. Baden also found it difficult to tell from the photographs if the carotid artery was severed. These two experts, called by [Appellant], cast serious doubt on the witness who appeared to provide the most convincing testimony to the federal district court: Ken Zeyak.[19]

(*See id.* at 106–07) (internal citations omitted).

¶ 64 The Commonwealth presented the testimony of Roger J. Levin, M.D., professor of otolaryngology at the Penn State College of Medicine in Hershey, PA. He testified that he performs neck surgery at least three times a week. Much of his experience is in the area of oncology and he has experience in traumatic injuries to the throat and neck. Dr. Levin later identified as "strap muscles" what Mr. Zeyak had previously identified as the severed left carotid artery.

¶ 65 In reviewing Dr. Levin's testimony, the PCRA court stated:

19. The PCRA court noted the following with respect to Mr. Zeyak. Zeyak was a volunteer EMT in 1992, the first of medical personnel to arrive at the scene of the murder. His training consisted of five months, eight hours per week. He learned the location of the carotid artery in basic anatomy, and admitted that his training as a nurse subsequent to the incident of December 20, 1991, provided him with more anatomy training. Although he recalled a clear observation of the left carotid and

Dr. Levin testified that it was very "unlikely" that [the victim]'s carotid artery was cut. He based this on the autopsy report and autopsy and crime scene photographs. In direct contradiction of Mr. Zeyak, Dr. Levin testified that he could not see the carotid artery, much less a cut carotid artery, on any of the autopsy photographs. He opined that the carotid artery lies deep to the sternocleidomastoid muscle and offered his opinion from the photographs that the sternocleidomastoid muscle was intact on [the victim]. According to Dr. Levin, several of the "strap muscles" anterior to the sternocleidomastoid muscle were severed and a portion of the sternocleidomastoid muscle was cut but the muscle itself was intact. This suggested to Dr. Levin that the carotid was intact as well. Further, Dr. Levin noted that in Dr. Penades' autopsy report, the carotid was observed and found to be uncut and intact.

(*See id.* at 108–09) (internal citations omitted). In summarizing Dr. Levin's opinion, the PCRA court stated:

Dr. Levin opined that [the victim] could have been alive and that medically speaking, she had the capacity to utter weak, breathy sounds such as her mother described. Dr. Levin also testified that with [the victim's] head cradled in the fashion described by Mrs. Show, the internal airways could have been sufficiently closed to allow air passage through the larynx such as to create some speech. He believes it would not have been a complete closure and that air would have been escaping through

noted it was severed, he had never seen an autopsy or an exposed carotid artery in his EMT training. Moreover, he had never viewed a model of the neck structures, though he believed there may have been diagrams in his anatomy texts. The court remarked that it was interesting how Zeyak was able to see and identify the carotid artery on photographs, which were of no assistance to two world famous forensic pathologists, Drs. Baden and Smiaiek. (*See id.* at 107–08).

the holes in the neck, but that some closure sufficient for speech could have been achieved.

(*Id.*)

¶ 66 The Commonwealth also presented the testimony of Joseph L. Burton, M.D., a forensic pathologist who was the chief medical examiner for four counties in and around Atlanta, GA. In summarizing Dr. Burton's testimony and opinion, the PCRA court stated:

> Dr. Burton was the only medical witness who acknowledged that medicine has its limits. He testified as to the physiology and the anatomy involved in speech, particularly in the victim of this crime. He also testified that frequently events occur which appear to be impossible from a medical standpoint. Dr. Burton ... was the only medical expert who assessed the situation taking into account the medical facts and the clinical picture. Dr. Burton testified that the presence of [the victim's mother] may have stimulated and aroused [the victim]. Dr. Baden and Dr. Smialek were impressive with their knowledge and their background, but neither acknowledged the need to consider the clinical picture in the context of the medical possibilities. The clinical picture in this case is what Mrs. Show saw and heard and did.
>
> Dr. Burton offered the following expert opinions: (1) there was no anatomic evidence that [the victim] could not speak; (2) there was no forensic or medical evidence that the carotid artery was severed; (3) he could not identify the carotid artery in the autopsy photographs; (4) [the victim] could have been conscious when her mother returned to the condominium; and (5) the carotid had been dissected by Dr. Penades.

(*Id.* at 110–11).

¶ 67 The last medical expert to testify on behalf of the Commonwealth was Wayne Kenneth Ross, M.D., forensic pathologist for Lancaster County, PA. The PCRA court summarized his testimony as follows:

> Dr. Ross took exception to most, if not all, of the expert opinions offered by Drs. Baden and Smialek. Unlike his colleagues, Dr. Ross believes that (1) [the victim] was conscious when her mother came home; (2) [the victim] was capable of speech; (3) cradling [the victim]'s neck could reestablish her airway and make speech possible; (4) [the victim] was alive when the neck wound was inflicted; (5) the carotid artery was not severed; and (6) Dr. Penades did dissect out the neck.

(*Id.* at 111). Dr. Ross also concluded no one could tell from the photographs whether the carotid arteries had been severed. (N.T. PCRA Hearing, 6/19/98, at 7369). Following its discourse on the testimony offered with respect to the victim's dying declaration, in light of the testimony of the victim's mother, the PCRA court made the following findings:

> This collection of expert opinions all goes to whether the testimony of Mrs. Show in July 1992 was credible. Experience teaches that expert opinion is sometimes helpful, sometimes not.... Dr. Burton's admonition that we must look at the clinical picture in conjunction with the medical evidence is most helpful. Drs. Levin, Ross, Penades, Annese and Burton all testified that what Mrs. Show perceived was possible. They did not say it happened, they did not say that it did not happen. They only said that what Mrs. Show observed was medically and physiologically possible.
>
> For purposes of our PCRA hearing, all this testimony comes under the heading of "after-discovered evidence." On the first issue, all of this evidence was available at trial. The essential facts, the autopsy photographs, the autopsy report and the essence of the dying declaration, were all well known in 1991 and 1992. Had [Appellant] chosen to do so, she could have called expert witnesses to testify as to what Drs. Baden, Smialek and Larson said at the PCRA hearing. Nothing about the essential facts as to

the dying declaration has changed. The only after-discovered evidence is the expert analysis of those facts.... Expert opinion may well be a subsequent interpretation of the available evidence and might be "after-discovered" in the sense that no one inquired as to these opinions at the time of trial. But the essential facts, the evidence on which these opinions are based, are the same today as they were in 1991 and 1992.

Is the after-discovered evidence exculpatory? The opinions are mixed and there is disagreement among the experts as to whether [the victim] could have spoken. Certainly the opinions of experts who testified favorably as to [Appellant] would be exculpatory as to her position. Yet these are only exculpatory opinions, not exculpatory facts or evidence.

Finally, would the new "opinions" have changed the outcome of the trial? This court has considered the expert opinions in 1992 and the expert opinions in 1998 and finds nothing that would have changed the verdict in this case. The testimony of Dr. Larson, a speech professor, was informative but largely in a theoretical sense. He "picked out" the carotid artery on the autopsy photographs and offered an opinion that it was severed. But Drs. Baden, Smialek, Levin, Burton and Ross, all medical doctors, said that they could not determine whether the carotid artery was severed from a review of the same photographs.

\* \* \*

In an analysis of whether the new "opinions" would have changed the outcome of the trial, we begin with the testimony of Mrs. Show. We found her to be credible in the 1992 trial. At that time we had the benefit of the testimony of Dr. Penades and Dr. Annese, both of whom carefully observed the structures in [the victim]'s neck during the autopsy. We found them to be credible. Based on their examination of the neck wound, the vocal tract, and the structures of [the victim's] neck during the autopsy, they

offered opinions which have yet to be contradicted in any credible way.

[Appellant]'s case, led principally by Dr. Larson, assumes that [the victim]'s throat was cut. The court is asked to conclude on this basis that there was no possibility of speech and that death followed the infliction of the wounds in a very short time. We find that there is conclusive evidence that the carotid artery was not cut. [Appellant] would have this court ignore the autopsy report and the testimony of Drs. Penades and Annese. In the alternative, [Appellant] would have us believe that the autopsy report was falsified and that these two physicians lied under oath about findings in the autopsy. We simply find no support anywhere in the record of this case for that argument. We observed Drs. Penades and Annese testify, we considered their testimony and find no basis to conclude that they were lying.

The testimony of the EMTs carries no weight on this issue. Only Mr. Zeyak is sure that the carotid artery was cut but he did not, and does not, have the medical expertise to make this finding. Dr. Baden's and Dr. Smialek's testimony that [the victim] would have died, or would have been without brain function, before Mrs. Show arrived is contradicted by witnesses at the scene who observed signs of life. The medical personnel and neighbors arrived well after Mrs. Show came back into her home and found her daughter. The more credible and persuasive expert testimony was that of Drs. Levin, Burton, and Ross.

The "battle of the experts" has not shaken the credibility of Mrs. Show on this issue. [Appellant] contends that Mrs. Show did not tell anyone that [the victim] said "Michelle did it" until nearly two hours after the murder. Lisa Hinkle Billiter, the registered nurse on Community Hospital's life support unit ... testified that after attending to [the victim], she and the other medics left the

bedroom and approached Mrs. Show in the living room.... At that time, Mrs. Show "explained that she felt that [the victim] had—that she'd been setup, that she'd been made to go to the school for a guidance counselor appointment that was never to occur, and that ... Laurie had said to her 'Michelle did it.'" This statement by Mrs. Show occurred well before her police interviews and reveals that [Appellant]'s contention that the dying declaration was "suggested" to her by the police is baseless.

No expert has established that it would have been impossible for [the victim] to speak. In fact, competent and credible expert testimony proves in a clear and convincing way that the dying declaration was possible. No evidence was presented in 1992 or has been presented in the PCRA hearing which would cause this court to change its finding that Mrs. Show was credible in 1992 when she testified as to her daughter's dying declaration. The expert opinions in 1998, had they been presented in 1992, would not have changed the outcome of the case.

(*Id.* at 111–16) (internal citations omitted). The record supports the PCRA court's findings of fact and credibility determinations. Accordingly, they will not be disturbed. *See White, supra; Yager, supra.*

(2) **The [PCRA] Court's Conclusions Concerning the Commonwealth's Tampering with [Appellant]'s Trial Expert are Patently Erroneous and Wrong as a Matter of Law.**

¶ 68 Next Appellant contends that the Commonwealth tampered with her trial expert, Dr. Isidore Mihalakis. Appellant asserts that the Commonwealth caused him to change his trial testimony in 1992. Appellant claims that the prosecution directly communicated with and intimidated Dr. Mihalakis on the eve of her 1992 trial with the intent and purpose to change his testimony. In a direct conclusion, without elaboration, Appellant states

on appeal that the prosecutor's contact with and intimidation of Dr. Mihalakis in this regard constituted violations of Pa. R.Crim.P. 305 (Pretrial Discovery and Inspection) and the Rules of Professional Conduct, Rule 8.4(d), which provides:

**RULE 8.4 MISCONDUCT**

It is professional misconduct for a lawyer to:

(d) engage in conduct that is prejudicial to the administration of justice.

(Rules of Professional Conduct, Rule 8.4(d)). Appellant asserts that the Commonwealth tampered with her witness with the intent or threat of retaliation to the point that Dr. Mihalakis offered to withdraw from the defense and to change his testimony. Appellant maintains that evidence to this effect was first available through federal discovery, where it was also shown that Dr. Mihalakis earned almost $42,000.00 in fees from Lancaster County in the year after his testimony. Appellant concludes that this evidence shows a "shocking story of unethical prosecutorial overreaching." We do not agree.

¶ 69 Shortly before Appellant's 1992 trial, defense counsel informed the Commonwealth that Dr. Mihalakis would be testifying for the defense. Prior to this time, Dr. Mihalakis had entered into a contract with Lancaster County to provide forensic pathology services in criminal cases. Appellant's trial was scheduled to begin on Monday. Over the weekend, the prosecutor called Dr. Mihalakis to express concern about his decision to testify for the defense. In addressing Appellant's issue, the PCRA court stated:

The issues regarding involvement of Dr. Mihalakis were raised at trial and in post verdict motions, and considered by this court in its opinion of July 19, 1994. Nevertheless, [Appellant] has included this issue in her case. The Commonwealth argues that this issue has been previously litigated.... Because [Appellant] raised a claim of after-discovered evidence and "witness tampering"

with respect to Dr. Mihalakis, we will address this issue in this opinion....

\* \* \*

There was absolutely nothing about [his] testimony [at trial] which was in any way inconsistent with Dr. Mihalakis' report to defense counsel of June 29, 1992. [Dr. Mihalakis'] report was prepared before [defense counsel] informed [the prosecutor] that Dr. Mihalakis would be testifying and before [the prosecutor] had any contact with Dr. Mihalakis. In the report of June 29, 1992, Dr. Mihalakis addresses a question put to him by defense counsel's investigator:

> Question 3: Could [the victim] say anything afterward; could she have said, "Michelle did it"?
>
> Answer: The wound track of the neck wounds described by Dr. Penades involves cutting of a major portion of the base of the tongue except for possibly the pillars on each side. Such a cut would certainly but not totally eliminate phonation especially words and letters that involve the tongue. M is a letter that is primarily phonated by the lips. If the head is down and air can pass from the windpipe to the mouth M could certainly be enunciated. "Chelle" [is] somewhat more difficult to enunciate and "did it" [is] very much tongue-dependent so that would be very difficult to enunciate but not totally impossible depending on how much tongue muscle was left. We are told by Dr. Penades that one could look at her throat and see the vertebral column. However, we are not told about the sides of the tongue. The other factors that must be taken into consideration are the recurrent laryngeal nerves. If one such nerve is cut, it causes a hoarse voice, and if both are cut, the cords assume a midline neutral position, and at best, the only sound that can be made is a "breathy" type sound but hardly any intelligible speech. Neither Dr. Penades nor his consulting otolaryngolo-

gist, Dr. Joseph Annese, addresses the status of the recurrent laryngeal nerves. In spite of this shortcoming I believe that these nerves were not cut because they are tucked in such a location that to selectively injure them without cutting the carotids and deep jugular vessels is essentially impossible. Thus, for all intents and purposes, you have to consider phonation based on the injury to the tongue.

( [Appellant]'s Exhibit 2090).

At the colloquy in chambers ... Dr. Mihalakis acknowledged that he had been contacted by [the prosecutor]. He testified that he did not feel intimidated or coerced by [the prosecutor]. He stated clearly, unequivocally, and emphatically that he would testify at trial consistent with his ... report.... When he said that he would testify to the opinions expressed in his [consultative] letter, he was completely credible. And, in fact, his testimony at trial bore out this representation.

\* \* \*

The problem was that Dr. Mihalakis did not give the testimony that [defense counsel] had in mind. [Defense counsel] testified in this PCRA hearing that he was aware of the report and did not think the report was very helpful. In fact, [defense counsel] testified that he told Dr. Mihalakis that the report wasn't going to "help us a lot." After a discussion with Dr. Mihalakis about the report, [defense counsel] seemed to think that Dr. Mihalakis could possibly be more helpful in court than he was in his letter. However, [defense counsel] testified that Dr. Mihalakis "indicated to me at all times that he would not be able to say, to a degree of medical certainty, that [the victim] could not talk."

\* \* \*

In fact, [defense counsel] and [Dr.] Mihalakis had a meeting ... just prior to Dr. Mihalakis' testimony. There is no doubt that they knew what Dr. Mihalak-

is was going to say on the witness stand. In fact, in this PCRA hearing, Dr. Mihalakis testified that there was "no doubt in my mind that [defense counsel] knew very much what I was going to say." The only new evidence presented at the PCRA hearing had to do with Dr. Mihalakis' income from the county. Dr. Mihalakis testified that his income from Lancaster County increased because there was an increase in murder cases in Lancaster County.... It is clear that his compensation increased because there was an increase in homicide cases in Lancaster County in 1992 and 1993. To take the fact of increased compensation out of context and attach some sinister significance to this is misleading. As testimony established, Lancaster County was in a period of transition in 1992 in terms of handling murder cases. Dr. Penades, who had been the county pathologist for years, was in the process of retiring. The district attorney entered into a contract with Dr. Mihalakis dated April 8, 1992 for consulting services involving forensic pathological examinations, assistance in criminal investigation, training, and expert testimony at preliminary hearings and trials. Pursuant to this agreement, Dr. Mihalakis performed autopsies in 1992 and 1993. He also testified in several major cases in 1993. His income began to trail off after 1993 because of the involvement of Dr. Ross, a forensic pathologist who took over these responsibilities in Lancaster County on a full-time basis in 1994.

According to the testimony of [the Commonwealth], ... uncontradicted on this point, there was a significant increase in homicide cases in their office in 1992 and 1993.... In a year where there is a significant increase [of homicide cases], there is a significant strain on the system and a significant increase in the need for, among other things, expert testimony from a forensic pathologist. When given more than superficial con-

sideration, the increase in compensation **does not even come close** to the kind of "payola" pronounced by [Appellant]'s counsel.

(*See* PCRA Court Opinion at 181–93). Lastly, with respect to the prosecutor's contact with Dr. Mihalakis, the PCRA court wrote:

Did it violate any stated canon of professional responsibility? The answer to that is no. In fact, counsel for the defense was asked to point to any violation of the Rules of Professional Responsibility.[83]

---

[83] The district court found that [the prosecutor]'s "violation" of an ethical duty in contacting Dr. Mihalakis was a "no-brainer." This finding is just not true. At least three bar association ethical committees have concluded that the Rules of Professional Conduct do not expressly prohibit a lawyer from contacting an expert retained by opposing counsel and that the resolution of the issue is "fact sensitive." *See* Philadelphia Bar Association Professional Guidance Comm., Guidance Op. 94–22 (1995). *See also* ABA Comm. on Ethics and Responsibility, Formal Op. 93–378 (1993); New York State Bar Ass'n, Comm. On Professional Ethics, Ethical Op. 577 (1986).

This was more than simply an advocate contacting his opponent's expert witness. In fact, [the prosecutor] and Dr. Mihalakis were involved in a contractual relationship that was in existence for only three months at the time of the trial. This expert was "sprung" on the Commonwealth just before trial in that [defense counsel] informed [the prosecutor] that Dr. Mihalakis would be testifying in a conversation on July 2, 1992. Trial was set to begin the following Monday. These extenuating circumstances explain [the prosecutor]'s displeasure at [defense counsel]'s retaining of Dr. Mihalakis and at Dr. Mihalakis' willingness to assist the defense. His call to Dr. Mihalakis was the result of this displeasure.

\*　　\*　　\*

The court does not make evidentiary rulings based upon allegations of unethical conduct. The court can sanction

counsel, can warn counsel and can suggest appropriate disciplinary action. The remedy for a violation of the Rules of Professional Conduct is disciplinary action. While the contact . . . created an issue in the 1992 trial, this court saw no reason for a mistrial based upon a demonstrated lack of prejudice to [Appellant]. The court saw no basis on which to refer [the prosecutor] to the Disciplinary Board. The court also notes that in the ensuing years, neither [defense counsel] nor Mr. Goldberg nor Mr. Epstein nor [Appellant] nor [Appellant]'s family saw fit to refer this issue to the disciplinary authorities. It was arguably improper conduct with some justification under the circumstances. The bottom line is that it did not affect the witness' testimony. He testified consistent with his report and his testimony was no surprise to [Appellant]'s counsel.

The question remains why did [defense counsel] call Dr. Mihalakis under these circumstances? . . . It is likely that Dr. Mihalakis was put on the stand because of his strong testimony on the time of death, the time for loss of consciousness, and the difficulty in phonation or enunciation. The fact that he did not rule out speech does not mean he was useless to the defense.

(*See id.* at 193–96) (footnote omitted). As evident from its analysis, the PCRA court carefully considered this issue in light of the applicable law pertaining to ineffective assistance of counsel and after-discovered evidence. *See Stevens, supra; Carbone, supra.* The PCRA court properly rejected this claim.

### G. The River Search

■ ¶ 70 Here, Appellant argues that the Commonwealth witnesses perjured themselves at trial when they testified about their search of the Susquehanna River shortly after the murder. According to Appellant, Yunkin put his size 12 sneakers, worn on the morning of the murder, along with other items in a pink trash bag, weighted it with rocks and ordered Appellant to throw it into the river. When she threw it, however, it fell on the rocky riverbank. Appellant contends that the riverbank search was videotaped and edited for trial, which allowed the Commonwealth witnesses to commit perjury to impeach Appellant's credibility. Appellant also maintains that it was impossible to implicate Yunkin because the bag and the sneakers were supposedly never found.

¶ 71 During the federal court proceedings, however, the Commonwealth disclosed an unedited version of the river search videotape. Appellant claims that this version shows a pink bag located precisely where she insists she threw it. She further claims that the Commonwealth witnesses on this issue falsely testified to the results of the search and only later "miraculously recalled" more details as a result of disclosure of the unedited tape. The issue, Appellant argues, is how long the pink bag was empty and whether, at some point, it was **not** empty. Appellant concludes that there is no way to test the veracity of these witnesses' later explanations in light of their earlier false testimony.

¶ 72 The PCRA court's analysis of this issue is as follows.

On December 22, 1991, two days after the murder of [the victim], the police conducted a search of the Susquehanna River near the Pequea Creek inlet. Two critical pieces of evidence were found: a large butcher knife and a rope. This search was conducted by the East Lampeter Township Police Department with the assistance of local scuba divers. The search was filmed by William "Smokey" Roberts, a professional scuba diver and videographer. Mr. Roberts reviewed, edited and copied the tape made of the search for the police and the district attorney's office.[92]

---

[92] The federal testimony by Mr. Roberts, after viewing both videotapes, was that he

had, in fact, edited the video before giving it to the police....

Only this edited version was turned over to [Appellant]'s defense attorney. [Trial counsel] testified to seeking the river search tape at the East Lampeter Township Police Department. He also stated that he received a copy of Officer Reed's report that stated the videotape was edited by Smokey Roberts "to cut down on time span and to eliminate unnecessary background noise." At no time, however, did [trial counsel] request a copy of the unedited tape.

[Appellant] contends that the police and/or prosecution edited the videotape to delete allegedly exculpatory evidence of the police finding a pink bag at the river. The edited tape, however, showed an empty pink bag embedded in ice. This pink bag was determined by the police to be immaterial to the case and so was not recovered. The edited tape also showed another empty bag of indeterminate color which was found by the police along the river bank. However, this too was found to be irrelevant to the investigation and was not seized as evidence.

At trial, Detective Barley was questioned by defense counsel as to whether during the river search he found a trash bag containing sneakers. He stated he did not. [Trial counsel] explained in his PCRA testimony that he did not impeach Detective Barley with the video, which clearly shows the discovery of a pink bag, because he assumed it was one of many things found at the river that simply was not relevant to the investigation. As [trial counsel]'s testimony reveals, it is reasonable to interpret Detective Barley's answer as a denial that a trash bag with evidence in it, i.e., Mr. Yunkin's sneakers, the rope, the knife, two pairs of sunglasses and the hats, was found during the search. The evidence before this court, testimonial and

video, showed that the plastic bags were empty.[93]

[93] The federal district court concluded that a sneaker was found inside a plastic bag. However, a review by this court of both videotapes of the river search confirms that the pink bag and the other bag were both empty. A conclusion that one of these bags contained a sneaker requires a leap from the premise that Mr. Yunkin's sneakers were put in a plastic bag to the conclusion that because plastic bags were found, they must have contained sneakers **and** those sneakers were then destroyed by the police. This "leap" requires reliance on another unfounded assumption: that the police within a day or two after the murder, were doing everything possible to destroy proof of Mr. Yunkin's involvement. This is contrary to the credible testimony of both [prosecutors] that the Commonwealth was very interested in any evidence which would tie Mr. Yunkin into the murder. Further, this "leap" assumes that the police ignored another reality: That a bag containing Mr. Yunkin's sneakers but discarded by [Appellant] would have been further evidence of her involvement in the murder or in the conspiracy. Moreover, a sneaker was found but not until the second search conducted on December 23, 1991. Mr. Roberts was not present on December 23, 1991, and no videotape was done of that search.

Detective Barley's denial that he found a pink trash bag was immaterial to the case, especially in light of the fact that the disposal of a trash bag by [Appellant] was not an issue at trial. [Appellant] testified at trial that she disposed of a red bag [94] containing the rope, the knife, two pairs of sunglasses, the hats, Yunkin's sneakers and some rocks by throwing it into the Susquehanna River. Although [the prosecutor] questioned [Appellant] about the color and size of the bag and whether Mr. Yunkin threw anything in the river separate from the bag, he did not question that [Appellant] threw the bag in the river. At trial, the Commonwealth never contended that [Appellant] did not throw a bag into the river. To the contrary, the Commonwealth introduced Mr. Yunkin's testimony that [Appellant] **did** throw a bag into the river. This testimony had no effect on the outcome of the trial.

[94] On cross-examination [Appellant] explained that the items were first placed in a white bag and it was when they arrived at the

river that Mr. Yunkin took the white bag and placed it inside a red trash bag weighted down with rocks. [Appellant] then threw the red bag into the river. Mr. Yunkin testified that the bag thrown into the river was white.

A second river search was organized for December 23, 1991. At that time a diver discovered a sneaker in the Pequea Creek. Detective Barley determined that it had no evidentiary value because it was old, stained brown, decaying, packed with mud, had black rot, had rotted threads, and had clearly been in the water more than three days. It was found not in the river, like the rope and knife, but in the Pequea Creek inlet which empties into the river and, therefore, could not have been the sneaker the police were looking for. For these reasons, the sneaker was not seized as evidence.

[Appellant] contends that the undisclosed sneaker was exculpatory and, thus, kept from the defense. At the time of the search, the police knew only that: (1) Mr. Yunkin said that [Appellant] threw a trash bag containing shoes and rocks into the river, (Commonwealth's Exhibit 4, West Lampeter Township Police Supplemental Report by Officer Jere Schuler), and (2) [Appellant] said she had tossed sneakers into the river, ( [Appellant]'s Exhibit 2079). Thus, at the time of the search, the police would have believed that anything found in the river relating to the murder would incriminate [Appellant] because [Appellant] was the person who disposed of the evidence. Clearly, so early in the investigation, the police would not ignore evidence that might assist them in solving the murder, whether it incriminated only [Appellant] (if the sneaker was [Appellant]'s), or both [Appellant] and Mr. Yunkin (if the sneaker was Mr. Yunkin's, but discarded by [Appellant]). Thus, it is certainly plausible that an empty pink bag, embedded in ice, would be insignificant to the searching officers, as would a black, rotted sneaker that had been in the Pequea Creek for an extended period of time. The prosecu-

tors and police officers in this case could not then have known that [Appellant] would later disavow her pre-search statements and later implicate Mr. Yunkin. The investigation must be viewed in the light of what they knew when they acted.

(*See* PCRA Court Opinion at 215–20) (internal citations omitted) (emphasis in original). Viewing Appellant's assertions in light of the certified record, we would agree with the PCRA court that Appellant's challenge to the river search warrants no relief. *See White, supra; Carbone, supra; Santiago, supra; Hicks, supra.*

## H. [Appellant]'s Statement Contained Fabricated Pages and Was Taken [in] a Knowing and Intentional Violation of the Six Hour Rule

■ ¶ 73 Appellant asserts that the statement she gave to the police should be regarded with suspicion because it involves incriminating aspects for which she is not responsible. Appellant claims that Detective Solt typed the first five and a half pages and handwrote the last page and a half of the statement. Appellant maintains as significant the fact that the statement was also prepared on two different types of paper, typing bond and cheap copy paper. She contends that the handwritten addition to the statement is "bogus," and Solt's testimony concerning the statement is "totally lacking in credibility." Appellant further maintains that she did not actually **see** her statement and was not given a chance to review it by either her trial counsel or the prosecution at trial. She now insists that "it never occurred to her that her statement might contain something that she did not say." (Appellant's Brief at 37–41).

¶ 74 In response to these allegations, the PCRA court stated:

The typewritten statement taken by [Detective] Solt, i.e., the "Solt Statement," covers five and one-half typed

pages. Each of these pages was signed by [Appellant] in red felt-tipped pen upon completion of the statement. At the bottom of page six and extending to page seven, there is hand printed lettering and then cursive writing which contains an addition to the statement. This information was obtained by [Detective] Solt from [Appellant] in response to his question to her about whether she had anything further to add to the statement. The pages containing the hand printed and hand written portions are also signed by [Appellant].

[Appellant] contends that the hand printed [and] handwritten portion on the last one and one-half pages of her original statement are phony. She contends that she signed blank papers at the time of her interview but that she did not understand why she was doing that. She contends that [Detective] Solt "filled in" these signed papers with a "statement" which he created.

[Appellant] presented expert witness testimony from William J. Ries, a forensic document examiner. He testified that the recording of a statement from [Appellant] on "plain paper" as opposed to "statement paper" is "unusual and odd." He opined that a statement should be taken on "formal statement paper." He also opined that the signature of Lisa Michelle Lambert across the statement is "highly unusual." When asked whether he could tell if [Appellant]'s signature was placed on the document after the statement itself, he stated that "the red ink appears to be on top of the black ballpoint pen writing on page 7 of [Appellant]'s statement." Mr. Ries is a retired Philadelphia police officer with experience in examining documents. He testified as to the standard practice in Philadelphia, that is, the taking of a statement on "official statement paper." He could not give any reason for that practice other than compliance with department procedure and certainly could offer no opinion as to

how the lack of "official statement paper" might affect the integrity of the contents of the statement. Mr. Ries gave his commentary on [Detective] Solt's methods and disapproved of the use of plain paper in favor of "official statement paper." He disapproved of the practice of having [Appellant] sign the statement across the page and noted that he has never seen this done.[98] Taken to its logical conclusion, Mr. Ries's opinion would suggest that [Detective] Solt should not have taken the statement because he did not have "official statement paper" available to him. The fact is that Mr. Ries really had very little to offer this court by way of criticism of the "Solt Statement." His opinion failed to take into account that Corporal Solt was taking a statement in the middle of night in a local police station using materials available to him. Mr. Ries's tone of disapproval and his inconsequential criticism of [Detective] Solt's methods were of no help to this court and appeared to be little more than advocacy dressed in expert's clothing.

---

[98] Mr. Yunkin had, in fact, signed his statement the very same way. ( [Appellant]'s Exhibit 1661.)

Detective Solt testified that he used the paper available to him in the East Lampeter Township Police Department. The first section of the statement, that is the five and one-half typed pages, is on bond paper, which he obtained from a secretary's desk by the typewriter he was using to type her statement. [Appellant] was then transported to another room of the station and, at that point, she began to give him additional information. He took the only available paper, from another desk, which was a different grading of paper, and began to record what she was saying, first in hand printed lettering and then in cursive writing. He testified that he switched from hand printing to cursive because he was writing quickly. Detective Solt testified at the PCRA hearing

that he saw her sign each page with a red pen after each paper was reviewed. The Commonwealth presented expert testimony from Lieutenant Joseph Bonenberger, a document examiner with the Pennsylvania State Police. He offered his opinion that the signature of [Appellant] is on top of the written and printed material on the last two pages of her statement. Under microscopic examination, he determined that wherever the red fibers crossed the other printing, there was a slight smearing. His conclusion was that the statement was signed by [Appellant] after the writing was placed on the paper.

(*See* PCRA Court Opinion at 223–26) (internal citations omitted). Regarding the content of the statement, the PCRA court wrote:

[W]e note that [Appellant] expressed familiarity with its contents at the 1992 trial. At the PCRA hearing, [Appellant] was reluctant to say that she had even read the statement in 1992. However, [trial counsel] noted that he went over the statement with her in detail. This would be consistent with basic, good practice for a criminal defense lawyer and [trial counsel] has demonstrated a high level of skill, dedication and expertise at a very high level. It would be unbelievable to this court that [trial counsel] would not have gone over [Appellant]'s statement with her in great detail in preparation for trial. [Trial counsel] is uncertain whether he actually showed her the statement or whether he had it in front of him and read portions of the statement to her in preparing her for trial. There really would be no significant difference between these two approaches. The fact is that she was familiar with the contents of her entire statement before trial. Her own trial counsel established this fact.

In fact, in 1992, [Appellant] was asked about what she told Corporal Solt. This question was in specific reference to her statement. She was asked, "Everything Trooper Solt said you said was the truth[?]." And she responded, "Yes." (N.T. Trial, [7/16/92], at 1035.)

Further, in a letter written from [Appellant] to Mr. Yunkin in the prison on December 23, 1991, she adopted the information she gave to Corporal Solt in the statement. (Commonwealth's Exhibit 16.) That is, her letter to Mr. Yunkin sets forth the same information with respect to her apparel on the day of the murder.

In the handwritten portion of the "Solt Statement," [Appellant] states she was wearing " … a red flannel shirt & White socks [ ] & black sweat pants." ([Appellant]'s Exhibit 1023 at 7.) She makes further reference to Ms. Buck getting "blood all over the arm of my flannel shirt." (*Id.*)

In the December 23, 1991 letter, she uses the same reference to how Ms. Buck grabbed her arm and "got blood all over my red flannel." (Commonwealth's Exhibit 16 at 2.) Also in the letter, she refers to fleeing with Ms. Buck and meeting up with her "down at the woods." (Commonwealth's Exhibit 16 at 3.)

Any contention that the handwritten (or printed) portion of the statement was made up by Corporal Solt after [Appellant] signed the statement is clearly contradicted by her own testimony at trial and her own handwritten letter to Mr. Yunkin of December 23, 1991.

(*See* PCRA Court Opinion at 229–31) (internal citations omitted). The PCRA court continued:

For PCRA analysis purposes, this issue of the "altered statement" involves neither prosecutorial misconduct nor after-discovered evidence. There simply is no proof of either under the elements required by the Act.

To establish prosecutorial misconduct, [Appellant] must prove by a preponderance of the evidence that Detective Solt had her sign blank pages and then com-

pleted, in his own handwriting, a false statement which he then attributed to [Appellant]. On this issue we have Detective Solt's sworn testimony against [Appellant]'s sworn testimony. Having listened carefully to the testimony of each witness, this court finds that Detective Solt is far more credible than [Appellant] on this issue. We consider their statements at the PCRA hearing together with all other evidence in this case both from the 1992 trial and from the balance of the testimony at the PCRA hearing. For one thing, [Appellant] was well aware in 1992 of the contents of her statement and never in her own testimony or through her lawyers' arguments made an issue of or raised a question about her statement. Her bald assertion that the statement was phony against Detective Solt's testimony as to the steps he took to obtain the statement carries no weight whatsoever. [Appellant]'s expert, Mr. Ries, does nothing to establish that the statement was the result of any prosecutorial misconduct. The Commonwealth's expert, Lieutenant Bonenberger, offers a reasonable opinion that the signature of [Appellant] was placed on the document after the typed, printed or written portions. This court really does not require the assistance of the experts on this issue. Given [Appellant]'s testimony, Detective Solt's testimony, [Appellant]'s letter of December 23, 1991, to Mr. Yunkin, and [Appellant]'s testimony at trial, we find there to be no basis for a finding of prosecutorial misconduct on this issue.

With respect to after-discovered evidence, the simple truth is that if the statement had been altered, the alteration was plainly available to [Appellant] at the 1992 trial. She is unable to meet the first prong of the after-discovered test, i.e., that the evidence was unavailable at trial. The contention that this was an "altered statement" is without merit under any analysis.

[Appellant] contends that Detective Solt is guilty of perjury in his testimony about the statement. There is certainly no basis for a finding that Detective Solt perjured himself in testifying about the statement. At best, his testimony is at odds with [Appellant]'s testimony.[99] We have already acknowledged that Detective Solt's testimony is at odds with [Appellant]'s testimony regarding the statement. We resolved in 1992, and we resolve again, this credibility issue in favor of Detective Solt and against [Appellant]. This inconsistency between these witnesses is not perjury as to either Detective Solt or [Appellant].

---

[99] We note that the federal district court found that the statement was a "fabrication." *See Lambert v. Blackwell,* 962 F.Supp. at 1541–42. There is no mention in the district court's analysis of the December 23, 1991 letter from [Appellant] to Mr. Yunkin nor is there any reference to [trial counsel]'s testimony about his reviewing the statement very carefully with [Appellant] prior to trial. Nor is there any reference to [Appellant]'s clear testimony at trial about the accuracy of the "Solt Statement." Perhaps had these important facts been available to the district court, the leap from "unique" to "fabricated" would have been approached with somewhat more caution. We do not accept the conclusion that Detective Solt's testimony about the statement was "perjury" based upon Mr. Ries's weak testimony that the statement was "unique."

(*See id.* at 231–33) (internal citations omitted).

¶ 75 Appellant also complains that the "egregious" misconduct regarding the statement was "compounded by Detective Solt's knowing and intentional violation of the six-hour rule." She claims she was "taken into custody at 10:30 p.m. and the vast bulk of questioning and statement occurred after 4:30 a.m., despite the district attorney's explicit instructions that interrogation was to cease...." (Appellant's Brief at 41–42). Appellant raised this claim before the PCRA court under the aegis of ineffective assistance of counsel for failing to challenge Appellant's statement as violative of the six-hour rule.

¶ 76 If a statement is obtained from an accused within six hours of her arrest, the statement is admissible absent coercion or other illegality. *Commonwealth v. Bridges,* 563 Pa. 1, 757 A.2d 859 (2000) (citing *Commonwealth v. Hughes,* 521 Pa. 423, 555 A.2d 1264 (1989); *Commonwealth v. Duncan,* 514 Pa. 395, 525 A.2d 1177 (1987)). Pennsylvania law makes clear that voluntary statements given by a defendant and initiated within six hours after arrest are not necessarily in violation of the six-hour rule simply because the process of obtaining the statement runs over the six-hour deadline. *Commonwealth v. Odrick,* 410 Pa.Super. 245, 599 A.2d 974 (1991), *appeal denied,* 531 Pa. 660, 613 A.2d 1209 (1992).

¶ 77 Our review of the certified record discloses that, in fact, trial counsel filed a motion to suppress Appellant's statement to Detective Solt. At the pretrial motions hearing on May 22, 1992, Appellant's trial counsel withdrew the motion to suppress Appellant's statement on the record based upon *Odrick, supra* and as a matter of trial strategy. This issue was addressed in the PCRA court's opinion as follows:

> Detective Solt's candid testimony about his concerns for the *Duncan/[Com. v. ]Davenport[,* 471 Pa. 278, 370 A.2d 301 (1977)]* rule were intended to explain why he broke off the interview [with Appellant]. [The district attorney] advised him that he could take no new information but that he could obtain clarifications and confirmations of information he had already taken from [Appellant].
>
> [Trial counsel] was asked by [Appellant]'s counsel why he did not have the statement suppressed. [Trial counsel] testified that he was familiar with the *Duncan/Davenport* rule and that he felt it would be a fruitless exercise to seek to have the statement suppressed. He noted that [Appellant] all but confirmed the contents of her statement in the letter of December 23, 1991, to Mr. Yunkin. Sec-

ond, he was aware that recent developments in the law would probably have supported the use of the statement because [Appellant] had begun the statement within the six-hour period of time. Further, the last part of the statement, where [Appellant] changed her story as to her attire at the time of the murder, was apparently given voluntarily and not in response to questions.

[Appellate counsel], a specialist in criminal law from Philadelphia ... testified that he did not think there was any merit to a suppression issue based upon the *Duncan/Davenport* rule.

[Trial counsel] stated a clear tactical reason for not seeking to suppress the statement. He certainly had a reasonable basis for his course of conduct. The content of [Appellant]'s statement, even if the statement itself had been suppressed, would have been admitted through her subsequent letters and statements to others.

(*See* PCRA Court Opinion at 272–73). The record makes clear that Appellant and her cohorts were picked up by police for questioning at 10:40 p.m. Detective Solt's first contact with Appellant was at 1:50 a.m. At 2:45 a.m., Appellant furnished a written statement, which was essentially the alibi statement fabricated by Appellant, Yunkin and Buck for use in the event of a police inquiry. Appellant's "true statement" began shortly after 4:00 a.m. and was completed at 7:51 a.m. At that time, Detective Solt asked if Appellant wanted to add anything. At 8:07 a.m., Appellant signed the statement. We agree with the trial court that these events fall within the parameters of *Odrick, supra.* Moreover, counsel had a rational basis for withdrawing the motion to suppress the statement, as Appellant had repeated the inculpatory information from her statement in subsequent writings. Thus neither trial nor appellate counsel can be deemed ineffective for failing to pursue this issue. *See Stevens, supra.*

## I. The Commonwealth's Destruction of Evidence and/or Failure to Collect and/or Preserve Evidence

¶ 78 Here, Appellant simply lists a number of things she contends the Commonwealth destroyed or failed to collect or preserve. These items include the "pink bag" from the river video; the 911 tapes (upon which the dispatcher allegedly determined that the victim was unconscious); Yunkin's baseball cap; the carpet in the Show condominium (because it allegedly had bloody footprints on it); Yunkin's car; the carpet in Yunkin's car; the license plate found in Yunkin's car; "true photographs" of the crime scene (Appellant claims the photographs produced were fabricated); photographs of a bloody handprint at the crime scene; crime scene logs and proof sheets; Detective Solt's "notes"; the "original" sweatpants; the tip of the knife; the victim's rings; the earring back found in the victim's hair; Buck's white sweatshirt; the full audiotape of Yunkin's statement; 30 seconds of the "unedited" video (pertaining to the river search); Smokey Roberts' log; Yunkin's mug shot; and photographs of the dissection of the victim's neck (if the dissection occurred). Appellant merely presents her litany and asserts that the "missing" evidence deprived her of a fair trial, and makes any retrial impossible. (Appellant's Brief at 42–43).

¶ 79 Following a review of the record, we conclude that most if not all of these items are not exculpatory, if indeed they even exist. Appellant's conclusory characterization of these items without more does not constitute a valid issue on appeal. *See Commonwealth v. Miller,* 721 A.2d 1121, 1124 (Pa.Super.1998) (refusing to consider merits of issues not properly raised and developed in briefs). Moreover, most if not all of these allegations were disposed of under other issues.

## J. The Commonwealth's Presentation of False Evidence

¶ 80 Under this subheading, Appellant repeats her previous allegations concerning the testimony of Lawrence Yunkin, Hazel Show, and the police. Appellant also assails all testimony concerning the crime scene, the river search, blood at the crime scene, "and many other points." (Appellant's Brief at 43). Appellant's conclusory characterization of the testimony without more does not constitute a valid issue on appeal. *See Miller, supra.* Moreover, these allegations were addressed and/or disposed of under other issues.

## K. Judicial Bias and Prejudice

¶ 81 Next Appellant voices her disgruntlement with the trial/PCRA court. Following her PCRA hearing, Appellant has no doubt that the court's mistakes, if any, were intentional. She contends that the PCRA court "unfairly attacked" Appellant's counsel and the federal court, and "mishandled witness testimony." (Appellant's Brief at 43). She maintains that the court's analysis of her issues was distorted with intentional misstatements and other actions by the court that establish bias and prejudice and "an independent, automatically non-harmless deprivation of due process and a violation of double jeopardy." (*Id.*) Appellant's demeaning characterization of the trial/PCRA court is not supported by the record. Without more, it does not constitute a valid issue on appeal. *See Miller, supra.*

## II.

¶ 82 In her second issue, Appellant presents several specific allegations concerning the "many organic errors" of the PCRA court "in its handling of the PCRA proceedings that the record is completely corrupted and the court's findings are entitled to no deference." (Appellant's Brief at 43). As her lead-in to specific complaints raised in Section II of her brief, Appellant generally attacks the court's conduct of the proceedings as "a virtual parody of a *bone fide* collateral attack hearing." (*Id.*)

## A. Failing to Admit or Properly Utilize the Federal Record

¶ 83 Here, Appellant asserts that the PCRA court erred when it refused to accept the record of the federal proceedings, which constituted an "overwhelming indictment of the Commonwealth's misconduct" in this case. (Appellant's Brief at 45). Appellant claims the PCRA court's decision " 'flies in the face of Pennsylvania law.' " (Id.) Appellant insists that the PCRA court's refusal to accept the federal record constitutes "illegal discrimination in the enforcement of criminal law." (Id.)

¶ 84 The PCRA court devoted an entire opinion to this issue, dated April 6, 1998. We will summarize the essential relevant parts as follows:

It is [Appellant]'s position that no hearing is necessary on the PCRA petition because a hearing has already been held on the issues raised in the petition. [Appellant] asserts that the best course would be for this court to simply review the record of the habeas corpus hearing and make a determination on the merits of the PCRA petition. Despite the fact that the PCRA petition contains allegations of perjured testimony, intentional obfuscation of the truth, hiding of evidence, and lies told by the police, by the prosecutors, and by material witnesses, [Appellant] contends that there is no need for a hearing. Despite the fact that the PCRA petition contends that [Appellant]'s testimony at her 1992 murder trial was not accurate, that her statement taken by police at the time of her arrest was falsified, that the testimony she provided at the habeas corpus hearing was true and that she had reasonable explanations for any inconsistency in any of her testimony, counsel for [Appellant] made the very curious statement at oral argument that the PCRA court "need not make any credibility determinations."

The record of the 1992 trial, the record of the 1997 habeas corpus hearing and the contentions set forth in the 1998 PCRA petition describe nothing if not a complex web of disagreement and inconsistency. It appears that this case involves, above all else, a credibility dispute of great magnitude. Despite the obvious need for the PCRA court to resolve hundreds of credibility issues, [Appellant] contends that there is no need for a hearing in this court.

(See PCRA Court Opinion, dated April 6, 1998, at 2–3). Thus we have in a nutshell the argument made on Appellant's behalf before the PCRA court regarding the record from the federal habeas proceeding.

¶ 85 In its opinion, the PCRA court rejected Appellant's contention that the "full and fair hearing" contemplated by Pa. R.Crim.P. 1508 had already taken place in federal court, noting that the parties hotly disputed this matter. The PCRA court also rejected Appellant's contention that Commonwealth v. Wells, 322 Pa.Super. 380, 469 A.2d 672 (1983) (holding law requires court to consider full record of any evidentiary hearing, even if hearing held by different judge) was controlling. Wells dealt with the disregard by a successor judge of the notes of testimony taken before a prior judge in a PCHA hearing. This Court reversed, disapproving of decisions made on PCHA petitions by a judge who was not present at the hearing and who refused to review the notes of testimony. The PCRA court determined that Wells was not dispositive of whether the state court is obligated to accept the record of a federal proceeding.

¶ 86 Further, the PCRA court recognized that the Third Circuit Court of Appeals gave no weight or significance to the district court's findings. See Lambert, supra, 134 F.3d at 524–25. The resolution of Appellant's questions belonged in state court under the PCRA. Finally, the PCRA court rejected any suggestion that the Third Circuit Court of Appeals anticipated or expected wholesale admission of the

federal record in the state court proceeding.[20]

¶ 87 Appellant also takes issue with the PCRA court's refusal to allow the federal testimony to be used as admissions in the PCRA hearing. She argues that the police officers and prosecutors were agents of the Commonwealth and their testimony in federal court constituted admissions against the Commonwealth.

¶ 88 In response to this issue, the PCRA court stated:

On June 10, 1998, counsel for [Appellant] submitted a document entitled "[Appellant] Lisa Lambert's List of Admissions to be Offered into Evidence." ... We addressed the proposed use of [Appellant]'s federal *habeas corpus* record in this proceeding in an opinion filed April 6, 1998.

\* \* \*

Our position has not changed since that time. In fact, counsel for [Appellant] put the federal *habeas* record to good use during the PCRA proceeding. The record was used to impeach witnesses, to refresh the recollection of witnesses and, in the case of Officer Reed, to provide testimony where a witness has become "unavailable" for the PCRA hearing. The wholesale use of testimony from the federal proceeding and the ensuing necessary argument as to whether certain statements constitute admissions under the law was precisely what we hoped to avoid in holding a PCRA hearing. Now, after a lengthy hearing, we believe the request that we consider statements from the federal proceedings as "admissions" is superfluous. We, therefore, [denied] the request that the proposed admissions contained in [Appellant]'s pleading be used as evidence in this case.

(*See* PCRA Court Opinion, dated August 24, 1998, at 257–59). In support of this

conclusion, the PCRA court referred to *Lambert, supra,* 134 F.3d at 525, stating:

When the Third Circuit vacated the district court's order of April 21, 1997, the proceedings before the district court were rendered void *ab initio. See Stern [Stone] v. Williams,* 970 F.2d 1043, 1054–55 (2d Cir.1992), *cert denied,* 508 U.S. 906, [113 S.Ct. 2331, 124 L.Ed.2d 243] (1993) ([stating] "judgment [which has been vacated] or set aside has no preclusive effect"); ... *Rushton Mining Co. v. Morton,* 520 F.2d 716, 719 (3d Cir.1975) ([stating] by definition, vacatur renders lower court's order "void *ab initio*"). The Third Circuit's decision vacating the district court's judgment not only found the district court's hearing was invalid because it was without any authority to conduct that proceeding but [also] it expressly refused to give any weight to the district court's determinations: "[W]e do not give any weight to the district court's factual findings in this appeal." [*Lambert, supra,*] 134 F.3d at 509 n. 1. The merits panel said that "resolution of these difficult questions must ... await the appropriate forum." *Id.* at 524–25. Among the "difficult questions" identified were "serious factual issues concerning the district court's finding that [Appellant] was actually innocent of first degree murder." *Id.* at 524. The "appropriate forum" referred to is "the state courts." *Id.*

(*See* PCRA Court Opinion, at 19 n. 22). To this we add that under Pennsylvania law, only a **valid** judgment has preclusive effect. *See, e.g., McNeil v. Owens–Corning Fiberglas Corp.,* 545 Pa. 209, 680 A.2d 1145 (1996); *Balent v. City of Wilkes–Barre,* 542 Pa. 555, 669 A.2d 309 (1995). Therefore, we agree that the PCRA court was not bound to enter the suggested testimony from the federal proceedings as "admissions" in the state PCRA proceedings and that counsel was properly permitted to make use of the federal transcripts.

**20.** (*See* Footnote 9, *supra* ).

## B. Refusing to Allow Cross Examination of Police and Prosecutor Witnesses

¶ 89 Here, Appellant asserts that the PCRA court's credibility determinations are "bogus." (Appellant's Brief at 46). Appellant claims she had the right to cross-examine on direct any witness she called who was remotely connected with the murder investigation and her prosecution. Appellant maintains that these were the "very people who were found to have framed her by the federal court." (*Id.*) As such, Appellant reasons she had the right to ask leading questions of these witnesses. Appellant concludes that the PCRA court arbitrarily denied her that right, and in so doing, committed reversible error.

¶ 90 The PCRA court addressed this issue with the following analysis:

Early in [Appellant]'s case, she called Lieutenant Renee L. Schuler as a witness. [Appellant]'s counsel requested permission to cross-examine this witness because she was "hostile" or "adverse." This request was denied. On May 4, 1998, [Appellant] called retired Pennsylvania State Police Officer Carl S. Harnish. The request to treat the witness as hostile or adverse was renewed. We asked for case authority and each side presented legal argument.

[Appellant] cited *Commonwealth v. Butler*, 529 Pa. 7, 601 A.2d 268 (1991), in support of her request that she be allowed to cross-examine police witnesses on direct. Mr. Greenberg argued on behalf of [Appellant] that these proceedings went directly to the workings of the criminal justice system, that the police witnesses in this proceeding were hostile and adverse, as those terms are used in the law, and that justice required that [Appellant] be allowed to cross-examine each witness and to proceed with leading questions rather than standard direct examination. This court considered *Butler* and found it to provide no support for [Appellant]'s contention. We

indicated at that time that the question of a police witness being hostile or adverse could not be addressed in a blanket ruling. The court promised to consider the situation as to each witness and make a determination before, or during, that witness's testimony about whether the witness would be treated as a hostile or adverse witness.

We advised counsel that "hostility" required a showing of surprise during the witness's testimony or an obvious lack of cooperation, reluctance or evasiveness in answering questions. As to whether a witness is "adverse," the court informed counsel that such a declaration required a showing that the witness had a direct personal interest in the outcome of the litigation.

This same analysis was applied when former Detective Ronald C. Barley testified. On May 5, 1998, at the beginning of the afternoon session and during the time Mr. Barley was on the stand, Mr. Greenberg asked if he might "put a position on the record." He was given permission and made the following statement:

Your Honor, I feel obligated to put this position on the record to establish what our position is going forward in this proceeding so there's no subsequent question. And I want to assure the court that I'm not taking this position lightly.

The situation that I predicted yesterday is exactly as I then suggested. By immunizing the police and the prosecutor's witnesses from cross examination and in addition by allowing the Commonwealth to lead them, the court has made it impossible for the [Appellant] to properly put on her case.

Crucial points of witness testimony made explicitly in federal court that could be established by a single cross examination question that never will be asked in this proceeding now are removed from the record before this

court by witnesses' convenient losses of memory and recollection.

The result is that the record being made in our view, and our position is, is completely corrupted. We will go forward as we must to exhaust the alleged state remedies that are allegedly available to this [Appellant], but it's our position that this proceeding is without integrity in terms of finding fact and seeking truth and it's our position that any findings made herein against [Appellant] are entitled to absolutely no deference as a result in any subsequent court.

(N.T. PCRA [Hearing, 5/5/98], at 783–784).[39]

---

[39] The notes of testimony for this PCRA proceeding were lodged with the Clerk of Courts on August 3, 1998. There are more than 8,000 pages of testimony contained in 36 bound volumes. Counsel requested 30 days to review the notes of testimony and file objections to the transcript with the court. Given the enormity of the record, this request was granted on August 11, 1998. Therefore, citations in this opinion will be to the "unofficial" notes of testimony which are subject to change at a later date.

A reading of the text of Mr. Greenberg's diatribe does little to capture the disdainful tone of these remarks. When given an opportunity to present case law in support of his request to cross-examination police witnesses, he produced nothing. Faced with a ruling adverse to his position, he chose to stand in open court and assault the integrity of this court.

The issue of leading questions came up with every police or prosecution witness. In addition to Lieutenant Renee Schuler and former Detective Barley, [Appellant] sought to ask leading questions of First Assistant District Attorney Kenneff, Detective Raymond E. Solt,[40] and District Justice Ronald W. Savage,[41] among others. Because this issue featured so prominently throughout the

hearing, we have included a discussion of the law on this point.

[40] Detective Solt is presently employed by the Lancaster County District Attorney's Office. In 1991 and 1992 he was a corporal with the Pennsylvania State Police and assisted in the investigation of the Show murder.

[41] Ronald W. Savage was a detective with the East Lampeter Township Police Department in 1991–1992. At the time of the PCRA hearing, he was a district justice.

(*See* PCRA Court Opinion at 47–50) (internal footnotes 37 and 38 omitted). The court reasoned:

The general rule is that the party calling a witness is not permitted to examine him or her by means of leading questions. A leading question is one which puts the desired answer in the mouth of the witness.

One may, however, cross-examine his own witness where the witness proves to be hostile and unwilling, or where the party calling the witness is surprised by testimony of the witness inconsistent with prior statements. A thorough examination of the Pennsylvania case law associated with this exception reveals an abundance of cases which define "hostility" by way of the definition of "surprise," but an absence of any cases which offer a definition of the discrete term "hostile witness."[42]

---

[42] A federal court has offered the following definition: "A 'hostile' witness, in the jargon of evidence law, is not an adverse party but a witness who shows himself or herself so adverse to answering questions, whatever the source of the antagonism, that leading questions may be used to press the questions home." *Rodriguez v. Banco Central Corp.,* 990 F.2d 7, 12–13 (1st Cir.1993).

The term "hostile" has been considered by a number of courts. Where a party is surprised in the testimony of a witness by his unexpectedly turning hostile, counsel may exercise the right of cross-examination of the witness, or impeach his testimony by other witnesses. The party requesting leave to declare its witness hostile bears the burden of proving that statements by the witness were unexpected, contradictory to earlier statements, harmful to the party calling the

witness, and would result in injustice should the movant's request be denied. When one's witness turns hostile by telling a different version on the witness stand than he told the calling party prior thereto, the latter may plead surprise and request leave to cross-examine the witness and impeach him by his prior inconsistent statement. Clearly, the term "hostile" has been treated by Pennsylvania courts as involving an element of "surprise."

It is within the sound discretion of the trial court to decide whether counsel may exercise the right to cross-examine his own witness on a plea of surprise. In exercising its discretion, the trial court must apply a four-part test. First, the testimony given by the witness must be unexpected; second, the testimony must be contradictory to the witness's earlier statements; third, the testimony must be hurtful or injurious to the party calling the witness and beneficial to the opposing side; and fourth, the scope of the cross-examination may not be excessive.

Since the purpose of the cross-examination and impeachment is to induce the fact finder to disbelieve the testimony of the witness, there must be something in the witness' testimony, which, if believed by the fact finder, will be hurtful or injurious to the party calling him. Therefore, if there is no testimony which needs to be neutralized, or which if accepted unchallenged will not aid the opposite party, or which was not hurtful to the side calling him, there is no excuse for cross-examination to impeach or discredit.

Even without a plea of surprise, where the witness is identified with an adverse party and reluctant to testify against that party, leading questions may be used in direct examination within the discretion of the trial court. Since the issue depends heavily upon evaluating the witness's in-court demeanor, aspects of which may not even be reflected in the record, it is recognized that trial courts must be given discretion to determine whether a witness is hostile or unwilling to testify.

It is well settled that a witness who has an interest adverse to the party calling him may be called as on cross-examination. Whether a witness's interest is adverse to the party calling him to testify, for purposes of determining whether he could be called as if under cross-examination, is a factual determination within the court's discretion. This interest must be a direct interest in the outcome of the suit in which he is called. An agent-principal relationship alone is not sufficient. Indirect, contingent and supplementary interests will not suffice. Nor are employees of an adverse party ordinarily themselves "adverse" for purposes of permitting a party to call them as on cross.

In this case, we considered whether any of these police or prosecution witnesses had any legal rights or liabilities which would be affected by this court's decision on the PCRA issues. We approached this issue at the outset of the hearing by contemplating three possible remedies or outcomes in this case which could arguably affect these witnesses: (1) a new trial for [Appellant]; (2) a declaration that there has been prosecutorial misconduct and that she cannot be retried under *Smith;* and (3) a finding of prosecutorial misconduct which may be used to further a federal investigation that might be taking place.[43]

---

[43] The assumption, of course, is that the federal investigating authorities will be moved by what is decided here. It is already clear that the federal courts disregarded findings of fact made by this court in the 1992 trial, e.g., the dying declaration and the import of the "29 questions." It is already clear that Mr. Greenberg has taken a position that no court should give any deference to this court's findings and it is clear that whatever investigation is being done is at the request of the federal district court and by federal authorities, and not at the behest of any state court or by state authorities.

If this court would award a new trial to [Appellant], there would be no direct effect on any personal rights or liabilities of any of the police witnesses. New trials are granted by appellate courts in regular course. A declaration that because of intentional prosecutorial misconduct [Appellant] cannot be retried under *Smith* does not affect the personal rights or liabilities of any of these police or prosecution witnesses. To say that one or all of them might be disappointed with such a result is not to say that it would have a direct effect on the personal rights or liabilities of these individuals. The possible impact of this court's decisions in this case on the federal investigation demanded by the district court is contingent and remote. There is simply no basis to find that this court's decision in favor of [Appellant] would somehow prejudice the investigation against the police or that the converse is true. Even if the federal investigative authorities will look to this court's findings for additional information about the conduct of the police, that does not rise to the level of a direct personal interest in the outcome of this litigation. The fact that there may be some instructive or persuasive value in a collateral proceeding does not establish this kind of interest.

There simply was no basis to consider the police and prosecution witnesses adverse under Pennsylvania law. Nor was there any basis to find any of them hostile, with the exception of Officer Robert S. Reed, who was declared hostile and whose testimony will be dealt with below. All, except Officer Reed, demonstrated a willingness to answer questions.

The federal rules depart from Pennsylvania practice on this issue. Rule 611(c) of the Federal Rules of Evidence permits the use of leading questions on direct examination of a hostile witness, an adverse party, or a witness identified with an adverse party, **without any requirement of a showing of hostility or adversity.** Rule 611(c) suggests that witnesses who are adverse parties or identified with one may be presumed predisposed against the direct examiner without requiring a demonstration of that fact.[21]

\*     \*     \*

None of the police and prosecution witnesses listed above were parties in this case; their interests were adverse to [Appellant]'s only in a collateral sense. The simple fact is that [Appellant] had previously been involved in a federal *habeas corpus* proceeding where allegations of misconduct were made against these witnesses. That does not create a personal interest or stake in the outcome of this PCRA litigation.

21. The Pennsylvania Rules of Evidence, Rule 611(c) now provides for the use of leading questions **with the court's permission** by a party who has called a hostile witness, an adverse party or a witness identified with an adverse party. P.R.E. 611 and Comment—1998.

> Inclusion of "a witness identified with an adverse party" in the classification of witnesses who may be interrogated with leading questions is a significant improvement in Pennsylvania practice, bringing it in line with the practice in the federal courts and the courts of most other states. However, it is not clear how broadly the phrase will be interpreted. It may include a relative of an adverse party, a close friend, a business associate, an employee (or perhaps a former employee), and someone with an interest in the outcome of the case in common with that of an adverse party.
>
> Pa.R.E. 611(c) says that "ordinarily" leading questions may be used when cross-examining a witness. Ordinarily does not mean always....

David F. Binder, BINDER ON PENNSYLVANIA EVIDENCE § 6.11 (1999).

We note that Appellant's PCRA hearing predated the Pennsylvania Rules of Evidence (effective October 1, 1998). Nevertheless, Pa. R.E. 611 continues the common law practice of allowing the hearing court the discretion to permit or restrict or deny the use of leading questions under appropriate circumstances. *Id.*

[Appellant]'s counsel demonstrated hostility toward each of these witnesses by the tone and manner of their questioning, if nothing else. Their demonstrated hostility to these witnesses does not make the witnesses themselves adverse or hostile. This court had every opportunity to observe these witnesses on the stand. Each appeared willingly, some in response to a subpoena. There was no need for [Appellant] or the court to coerce their attendance at the hearing nor did their answers to any questions appear to be evasive. In fact, each appeared willing to answer questions. Each was cooperative and responsive. There was nothing about the testimony of any of these witnesses which would even suggest that any was hostile.

Leading questions are useful to exact truthful statements from a witness who has a clear and demonstrated tendency to give evasive, unresponsive or argumentative answers. Leading questions should not be used to exact admissions, in the manner of an inquisition, from a witness who is attempting to provide responsive answers to direct questions. Nor should leading questions be used to cut off a witness's opportunity to provide an explanation. In short, leading questions are not meant to be loaded questions. And when an affirmative answer is exacted from a witness to a line of questioning loaded with assumptions favoring only the inquisitor, the leading question becomes not a tool of truth but of advocacy and intimidation. Our decision to require direct questioning of witnesses called by [Appellant] is supported by the law and was a sound exercise in discretion. The fact. that the federal district court permitted leading questions of police witnesses in the *habeas corpus* proceeding does not dictate how this court should apply Pennsylvania law.

The record indicates that these witnesses were extensively examined and repeatedly impeached by [Appellant].

Under these circumstances, there was no abuse of the PCRA court's discretion. (*See id.* at 50–59) (most internal citations and quotation marks omitted) (emphasis in original).

¶ 91 To this comprehensive and well-reasoned analysis we add the following. The trial judge has wide discretion in controlling the use of leading questions. *Commonwealth v. Bell*, 328 Pa.Super. 35, 476 A.2d 439 (1984). The court's tolerance or intolerance for leading questions will not be reversed on appeal absent an abuse of discretion. *Commonwealth v. Johnson*, 373 Pa.Super. 312, 541 A.2d 332 (1988).

¶ 92 We also recognize that there is a difference between (1) calling a witness as on cross in the first instance, and (2) requesting permission to treat a witness as hostile. A party may call her adversary as a witness, as on cross-examination, and put leading questions to the witness, and draw from the adversary's testimony those facts or admissions which weaken the adversary's case or strengthen the case of the calling party. 42 Pa.C.S.A. § 5935; *General Equipment Mfrs., Inc. v. Westfield Ins. Co.*, 430 Pa.Super. 526, 635 A.2d 173 (1993), *appeal denied*, 537 Pa. 663, 644 A.2d 1200 (1994). However, a witness, other than a party is not considered adverse simply because his testimony is adverse to the calling party. *Suckling v. Pennsylvania Threshermen & Farmers Mut. Cas. Ins. Co.*, 426 Pa. 503, 233 A.2d 279 (1967). As the term is understood in this context, a witness is adverse to the calling party if the witness has an interest in the issue being tried, and his interest would be increased or promoted if the calling party's adversary prevails. *Dinger v. Friedman*, 279 Pa. 8, 123 A. 641 (1924). Thus, if the witness is not a party and has no "legal" interest in the outcome of the proceedings, then the witness is not an adverse witness. *Gaul v. Consolidated Rail Corp.*, 383 Pa.Super. 250, 556 A.2d 892 (1989), *appeal denied*, 524 Pa. 621, 571 A.2d 383 (1989). Whether a witness' inter-

est is adverse to the calling party is a factual determination within the trial court's discretion. *American States Ins. Co. v. Maryland Cas. Co.*, 427 Pa.Super. 170, 628 A.2d 880 (1993).

¶ 93 The statutory right to call witnesses as on cross-examination is confined to civil proceedings. *Commonwealth v. Dyminski*, 79 Pa.Super. 499, 1922 WL 2947 (1922); 42 Pa.C.S.A. § 5935. A PCRA hearing by definition is a criminal matter. *Lambert, supra*, 723 A.2d at 692. Accordingly, Appellant had no statutory "right" to call the Commonwealth's police officers and prosecutors as on cross-examination. Thus, Appellant had to demonstrate that the witnesses were hostile or adverse. We see no reason to disturb the PCRA court's findings on this issue. *See Johnson, supra; Bell, supra.*

### C. Blatantly Misrepresenting Supposed "Admissions" of [Appellant] that Never Were Made in any Proceeding

¶ 94 Appellant next takes issue with the PCRA court's Opinion. She highlights what she calls two "egregious" errors that compel relief. Specifically, Appellant contends that she never came close to suggesting, let alone admitting, "that she held down [the victim]'s **legs** while Tabitha Buck slit her throat" as referenced in the PCRA court's opinion. This "stunning error shows why this Court should not defer to the [PCRA] court's findings." (Appellant's Brief at 47). We disagree.

¶ 95 In Appellant's uncontested statement to the police, she admitted to restraining the victim by the **ankles** during the assault. Moreover, Appellant's reference to the PCRA court's opinion at pp. 87–88 does not demonstrate the kind of "egregious" error she claims. To the contrary, the PCRA court's opinion in these pages is merely reciting Appellant's story line to provide some context. The court

specifically cautioned that this section of its opinion **did not** represent its findings of fact. (*See* PCRA Court Opinion at 80.) Therefore, we refuse to accept Appellant's slant on this issue. *See Commonwealth v. Fisher*, 545 Pa. 233, 681 A.2d 130 (1996) (encouraging zealous advocacy but refusing to condone conclusory argumentation).

¶ 96 Appellant's second "egregious" example of error is that the trial/PCRA court relied upon her "admission that she purchased two **ski masks** prior to the murder." (*See* Appellant's Brief at 48, citing the PCRA Court Opinion at 87, 88). Appellant reasons that "on points this dramatic, it is difficult to imagine how the lower court could be so mistaken and could so unconstitutionally 'distort' the evidence." (*Id.*) Appellant concludes that the court's "incomprehensible errors are a dramatic reflection on its entire decisional process and show dramatically why this Court should independently review the record." (*Id.*)

¶ 97 In the instant case, Appellant testified at her 1992 trial that the evening before the assault, she went to K–Mart where she purchased "a rope and **two black hats.**" (N.T. Trial, 7/16/92, at 992). Again, this reference has been taken from that section of the PCRA court's opinion, which specifically stated that this section of its opinion **did not** represent the court's findings of fact. Moreover, it was clear to us from the PCRA court's description that it was referring to the black hats when it used the words "ski masks." [22] Thus, we cannot agree with Appellant that this constitutes the kind of "egregious" error that warrants disregard of the PCRA court's findings. Accordingly, we reject this contention.

### D. Completely Ignoring the Proper Standard of Review

¶ 98 Here, Appellant complains that the PCRA court utilized an improper

---

**22.** Assuming that the two black hats were knit hats of the type worn when skiing, we understand the PCRA court's reference to masks instead of hats and accord it proper perspective.

standard of review. Appellant contends that the PCRA court judge reviewed the evidence presented at Appellant's PCRA hearing based upon whether the evidence would have made a difference to **him,** "rather than utilizing the 'reasonable probability' standard required under the United States Constitution and Pennsylvania law." (Appellant's Brief at 48).[23]

■ ¶ 99 Pennsylvania law makes clear that it is generally preferable for the same judge who presided at trial to preside over the post-conviction proceedings. *Abu–Jamal, supra.* "[F]amiliarity with the case will likely assist the proper administration of justice." *Id.* at 510, 720 A.2d at 90. Only where it is adequately demonstrated that the interests of justice warrant recusal, should a matter be assigned to a different judge. *Id.* (citing *Commonwealth v. Rashed,* 496 Pa. 26, 436 A.2d 134 (1981)).

■ ¶ 100 Moreover, "where a criminal case proceeds before a judge sitting without a jury, there is a presumption that his knowledge, experience and training will enable him to disregard inadmissible evidence and other improper elements." *Commonwealth v. Harvey,* 514 Pa. 531, 536, 526 A.2d 330, 333 (1987). The judge's role may vary:

During trial,

The province of a trial judge sitting without a jury is to do what a jury is required to do, namely, consider all the evidence; reconcile contradictions and discrepancies in the testimony, if possible; dismiss what is incredible; and, from all that is presented, assemble a logical, continuous account which rings with verisimilitude, appeals to reason and convinces the judgment

that the controverted event occurred in that and in no other manner.

*Commonwealth v. Lemons,* 404 Pa. 263, 268, 171 A.2d 785, 788 (1961). With respect to post trial motions ... the trial judge's role is to consider and rectify, if necessary, alleged trial errors. ... [T]he roles of the trial judge at these different stages are not interchangeable.

*Commonwealth v. Nock,* 414 Pa.Super. 326, 606 A.2d 1380, 1383 (1992), *appeal denied,* 535 Pa. 656, 634 A.2d 219 (1993). Likewise, the judge's role in post-conviction collateral proceedings is to review the petitioner's allegations of error or defect to determine whether petitioner's case resulted in a "fundamentally unfair conviction." *Carbone, supra* at 1148. To accomplish this task, the court must assess the evidence presented in the PCRA proceedings to determine whether it meets the statutory requirements for relief. *See* 42 Pa. C.S.A. §§ 9542–9546.

■ ¶ 101 Mindful of these principles, the PCRA court wrote:

The PCRA statute and the case law provide certain elements which [Appellant] must establish by a preponderance of the evidence in each of the several areas she asserts. Each section requires the [PCRA] judge to determine what impact the evidence in question would have had at trial. The after-discovered evidence must have been unavailable, exculpatory and **would have changed the outcome of the trial if it had been introduced.** The prosecutorial misconduct charges require the court to determine whether the constitutional violations **so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.** Similarly, the PCRA requires [Appellant] to establish ineffec-

**23.** As a footnote to this issue, Appellant claims that she did not know about this particular judge's "rule" until the PCRA court issued its opinion in 1998 and, therefore, could not have previously raised a challenge to her jury trial waiver. She now insists that her jury trial waiver was invalid. Appellant provides no developed argument or citations to relevant case law in support of this contention. Instead, she presents her dispute in a conclusory manner. Accordingly, we will not address the issue of whether Appellant's jury trial waiver should be invalidated. *See Fisher, supra; Miller, supra.*

tive assistance of counsel **which rendered the truth-determining process unreliable.**

\* \* \*

In this case, however, there was no jury and there is no need for this court to project what might have mattered and what might have affected the jury's analysis of this case. Here, the court listened to the evidence in 1992, considered the arguments of counsel and determined the verdict. This court is in a unique position to say what would have made a difference in the truth-determining process in 1992. This court knows what affected the outcome of the case, knows what was important in the truth-determining process and knows what was material.

Our research has disclosed no appellate case law on the standard to be applied to a court who heard the initial case non-jury. It seems to make sense that the court[,] in a unique position of hearing a case non-jury[,] would have insight into the basis for the verdict that would not be available to a judge in a jury trial. To speculate about the impact of certain evidence on a jury when in reality the court itself heard the evidence and made the decision would seem both unproductive and unnecessary.

(*See* PCRA Court Opinion at 44–47) (emphasis in original). We agree with the PCRA court's assessment. The PCRA court's familiarity with the case does not put the court in a compromised position to assess the value of the PCRA evidence. If that were so, no judge could serve at a bench trial and again in PCRA proceedings in the same case. That result is simply not reasonable. Evidently, Pennsylvania law does not agree with Appellant's position either. *See Abu–Jamal, supra.* Therefore, Appellant's issue warrants no relief.

¶ 102 Based upon the foregoing, we hold that Appellant has not met her burden under the PCRA statute. Accordingly, we affirm the PCRA court's order denying

Appellant the collateral relief she requested.

¶ 103 Order affirmed.